# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Malone, 2012 IL App (1st) 110517**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICHARD MALONE, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-11-0517 |
| Filed<br>Rehearing denied | September 28, 2012<br>October 24, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction and sentence for armed robbery with a firearm were upheld where the State proved beyond a reasonable doubt that he committed armed robbery while using a firearm and the trial court did not err in imposing a 15-year sentence enhancement based on his use of a firearm. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-13397; the Hon. Mary Colleen Roberts, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Michael J. Pelletier and S. Emily Hartman, both of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary Needham, and Sari London, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE ROCHFORD delivered the judgment of the court, with opinion.

Presiding Justice Hoffman and Justice Karnezis concurred in the judgment and opinion.

**OPINION**

¶ 1        Following a bench trial, the trial court convicted defendant, Richard Malone, of armed robbery with a firearm and sentenced him to 21 years' imprisonment. Pursuant to section 18-2(b) of the Criminal Code of 1961 (Code), his sentence included a 15-year enhancement for using a firearm during the commission of the offense. 720 ILCS 5/18-2(b) (West 2008). On appeal, defendant contends: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) his conviction should be reduced to robbery because the State failed to prove that the weapon was a firearm; and (3) the 15-year enhancement violates the proportionate penalties clause. We affirm.

¶ 2        Defendant was charged with armed robbery for knowingly taking money from the person or presence of Betty Ross by the use of force or by threatening the imminent use of force while armed with a firearm. At trial, Ms. Ross testified she was working as a cashier at the Walgreens at 111th Street and Kedzie Avenue on March 6, 2008. At approximately 7:45 p.m. on that evening, she was working the front cash register when she saw defendant inside the store, near a display of St. Patrick's Day items. He was "wearing a hat pulled down over his face, and he was walking around the store with his hands in his pocket." The hat covered "[m]ostly his eyes."

¶ 3        Ms. Ross testified that defendant approached her cash register, at which point she was able to see his face from "the middle of his eyes all the way down." She thought he was standing too close to the cash register and so she asked if there was anything she could do for him. He responded that he was looking for a really cheap lighter. She directed him to a bowl of lighters and he reached in and took one out. Defendant paid her for the lighter, put it in his pocket, and walked to the door as if he was leaving. After another customer walked by and went out the door, defendant returned to the cash register and said he wanted another lighter. He took another lighter from the bowl, put it in his pocket, and handed Ms. Ross the

-2-

money to pay. When the cash register drawer opened, defendant reached his hand in the drawer. Ms. Ross pushed his hand out of the drawer and closed the drawer with her hip.

¶ 4 Ms. Ross testified she started to walk away from the cash register toward the store office. She heard a noise "like something heavy hit the counter." She looked over her shoulder and saw defendant holding a gun in his right hand. Ms. Ross described the gun as black or black and silver. Defendant was resting the gun on the counter. He told her to open the cash register. When she did so, defendant reached in and took money out of the top of the drawer and then left the store. Ms. Ross learned that defendant had taken approximately $110.

¶ 5 Ms. Ross testified that later that evening, at 11:15 p.m., police officers showed her a group of photographs. Ms. Ross told the officers she did not recognize the offender as being any of the persons in the photographs. The officers told her that the photographs were old and that "the person could be changed." Ms. Ross told the officers that she had to actually "see the person" and that she was unable to identify him from the photographs. Then the officers asked her whether it was "possible" one of the persons in the photographs could be the offender. Ms. Ross told the officers "it could be" possible, and then she identified a photograph of a person whose chin and lips looked similar to the offender's. She signed and dated the photograph she identified. This individual was not defendant.

¶ 6 Ms. Ross testified that at approximately 5 p.m. on March 7, 2008, police again showed her a series of photographs. Ms. Ross signed her name to the photograph of a man who is not defendant and is not the individual she identified the previous evening. Ms. Ross testified:

"Q. And *** you signed that picture because the jaw line and the lips looked similar to the offender?

A. I was told it was an old picture and it was possible, so I said okay it could be possible if they were very old pictures.

Q. All right. Now, *** who told you this? They told you this again at 5 o'clock on March 7 [2008]?

A. They told me that each time they showed me pictures.

Q. Each time they said this is an old picture?

A. Old pictures, so I have to consider if the person has aged since the picture or something like that, so I tried. Though I did say both times that I didn't think it was the person they wanted me to say it was.

Q. You said both times you didn't think it was?

A. I don't know. I didn't believe it was, and they told me they were very old pictures, and they wanted me to check and let's see a lineup with the person in it and so I agreed to it.

Q. But you signed them anyway?

A. Yeah, I signed them.

Q. They didn't force you to sign them?

A. No, they didn't.

Q. They didn't threaten you to sign them?

A. She said sign it right here, and I did.

Q. And had they pointed to a different picture would you have signed it?

***

A. I don't know."

¶ 7    Ms. Ross testified that on July 3, 2009, police showed her another group of photographs, and she identified a photograph of defendant as the "man who robbed" her. On July 10, 2009, Ms. Ross went to the police station and picked defendant out of a lineup.

¶ 8    Ms. Ross testified that on the evening of the armed robbery, March 6, 2008, the Walgreens had a store security surveillance system. Ms. Ross stated that, prior to testifying, she had viewed the footage depicted on the surveillance video and that it truly and accurately depicted the images of what happened during the armed robbery. The trial court viewed the video, a copy of which has been included in the record on appeal. The first video clip shows a man entering the Walgreens through the front door at 7:45 p.m. Ms. Ross testified that the man seen entering the front door was defendant. The video clip shows defendant wearing a jean jacket with white sleeves and a wide-brimmed camouflage hat.

¶ 9    The second video clip shows Ms. Ross standing behind the counter by the cash register at 7:47 p.m. Defendant approached, put money on the counter, and took a lighter that he placed in his left jacket pocket. Ms. Ross rang up the defendant's purchase and defendant moved to the right. Another customer passed defendant and left the store. Defendant took out some change, which he put on the counter to complete the purchase. Defendant put a glove on his right hand. The cash register drawer opened and Ms. Ross gave defendant his receipt. She closed the cash register drawer. Defendant took cash from his pockets to purchase another lighter. When Ms. Ross opened the cash register drawer again, the video shows defendant displaying an object that looks like a gun, which he held in his right hand. Defendant leaned over the counter and pointed the gun at Ms. Ross, who moved away to her right and closed the drawer. Ms. Ross then pushed buttons to try to open the cash register drawer again. When the drawer opened, defendant placed his left hand inside and grabbed money. Then he ran out of the store.

¶ 10    Ms. Ross was shown a group of still photographs from the video that she identified in court and that are included in the record on appeal. Ms. Ross stated that People's exhibit number 2 showed defendant entering the store. She identified People's exhibit number 3 as defendant almost all the way in the store, and People's exhibit number 4 as defendant standing inside the store, looking around. She identified People's exhibit number 5 as a photograph of defendant inside the store going past the front display. Ms. Ross identified People's exhibit number 6 as a photograph of defendant holding a gun in his hand and her pushing his hand out of the cash drawer. Ms. Ross took a pen and drew a circle around the gun that defendant held in his right hand.

¶ 11    Officer Michael Casey testified that on March 6, 2008, sometime after 4 p.m., he was off-duty and driving in the area of 114th Street and Spaulding Avenue. Officer Casey saw a man wearing a "blue denim varsity-type jacket with white fleece, and a camouflage *** hat" walking southbound on 114th Street. Officer Casey thought he knew the man, so he pulled

over to say hello. However, when Officer Casey pulled over, he realized that he had been mistaken about the person's identity and did not know him.

¶ 12    Officer Casey testified that the next day, March 7, 2008, he learned there had been a robbery at the Walgreens at 111th Street and Kedzie Avenue. Officer Casey reviewed the surveillance video footage of the robbery and noticed that the offender depicted in the video was the same person he saw walking at 114th Street and Spaulding Avenue the day before. Officer Casey knew it was the same person because he recognized his jacket, hat, his build, and the way he walked.

¶ 13    Detective William Donnelly testified he was assigned to investigate the armed robbery at the Walgreens. As part of the investigation, Detective Donnelly reviewed the surveillance video depicting the armed robbery. Then he and his partner, Detective Livingstone, canvassed the neighborhood around the Walgreens on March 7, 2008, and looked inside a dumpster in the alley of 11120 South Sawyer Avenue, which is across the street and southwest of the Walgreens. Inside the dumpster, Detective Donnelly saw the clothes which the offender had been wearing in the surveillance video. Detective Donnelly identified People's exhibit number 12 as a photograph of the clothes he found inside the dumpster. The photograph depicts a jean jacket with white sleeves and a camouflage fishing hat.

¶ 14    Detective Donnelly testified they called evidence technician Carol O'Donnell, who arrived at 11120 South Sawyer Avenue and retrieved the clothing from inside the dumpster. Ms. O'Donnell looked inside the jacket pockets and pulled out gloves, a black "doo-rag," and three lighters. Detective Donnelly requested that the items of clothing be processed at the State Police crime lab for DNA testing.

¶ 15    The parties stipulated that, if called to testify, Deborah Cott would testify she is a forensic scientist in the forensic biology DNA section of the Illinois State Police Forensic Sciences Command. She was assigned to the present case and received the pair of gloves, camouflage hat, black doo-rag, and jean jacket in a sealed condition. Ms. Cott used sterile swabs to collect possible cellular material from the cuff of each glove, the inside rim of the hat, two areas on the doo-rag and the collar area and inside cuffs of the jacket. Ms. Cott used proper protocol and procedures in collecting the swabs and preserved the swabs for future DNA analysis.

¶ 16    Lauren Schubert, a forensic chemist employed by the Illinois State Police Forensic Sciences Command, testified she performed DNA analysis on the swabs from the pair of gloves, hat, and doo-rag that had been collected by Deborah Cott. Ms. Schubert found a mixture of human DNA profiles on each of these items, indicating that each item contained DNA from two people. Ms. Schubert explained that the mixture was not in equal parts, but that there was a "major profile and a minor profile [on each item.] The major profile just means the majority of the DNA present came from one individual." Ms. Schubert testified that the major profile from the gloves, hat, and doo-rag indicated it came from a man; she was unable to determine whether the DNA from the minor profile came from a man or a woman.

¶ 17    Ms. Schubert also performed DNA analysis on the jacket and found "[t]he jacket was the mixture of at least two people. There's definitely a major contributor and then there are

minor types present[;] however, [she] can't determine if it's only one additional contributor. There could possibly be more additional minor contributors." The major profile from the jacket came from a man.

¶ 18    Ms. Schubert testified she compared the major profile from the gloves, hat, doo-rag and jacket and she formed the opinion within a reasonable degree of scientific certainty that the major profile from those items originated from the same individual.

¶ 19    Ms. Schubert testified she entered the major profile into a DNA database and was notified when an association was made. The parties stipulated that, if called to testify, Amanda Soland, a forensic scientist in the forensic biology and DNA section of the Illinois State Police Forensic Science Center in Chicago, would testify that the major DNA profile identified in the gloves, hat, doo-rag, and jacket matched the DNA profile of defendant. Ms. Soland determined that defendant could be excluded from the minor DNA profile which was identified in the gloves, hat, and doo-rag.

¶ 20    Detective Donnelly testified he learned there was an association as a result of the DNA testing and the name he received was Richard Malone (defendant). Detective Donnelly then compiled a photo array, including a photograph of defendant, and showed the array to Ms. Ross on July 3, 2009. Ms Ross identified the photograph of defendant as the person who had robbed the Walgreens in March 2008. She showed no hesitation in identifying defendant.

¶ 21    Detective Donnelly learned defendant was already in the Cook County department of corrections. Detective Donnelly obtained a writ to take defendant out of jail on July 10, 2009, and brought him to the police station to conduct a lineup. Detective Donnelly testified that when Ms. Ross viewed the lineup she immediately pointed out defendant as being the man who robbed the Walgreens.

¶ 22    On cross-examination, Detective Donnelly testified there was no discernible fingerprint evidence recovered at the scene. During the first photo array conducted on March 6, 2008, Ms. Ross saw a man she thought resembled the offender. Detective Donnelly located that person but did not place him in a lineup or have him submit to a buccal swab. On March 7, 2008, Detective Donnelly showed Ms. Ross another photo array and she identified a different man (not defendant) as someone who resembled the offender.

¶ 23    On redirect examination, Detective Donnelly testified that on March 7, 2008, when Ms. Ross identified the man who resembled the offender, she stated that "she would need to see that man in person in a physical lineup." Detective Donnelly testified he subsequently placed that individual in a lineup but, after viewing the lineup, Ms. Ross did not identify him.

¶ 24    Following all the testimony, the trial court convicted defendant of armed robbery with a firearm and sentenced him to 6 years in prison, plus an additional 15 years imposed pursuant to section 18-2(b) of the Code, which provides that when a person commits armed robbery while in possession of a firearm, he commits "a Class X felony for which 15 years shall be added to the term of imprisonment imposed by the court." 720 ILCS 5/18-2(b) (West 2008). Defendant appeals.

¶ 25    First, defendant contends the State failed to prove him guilty of armed robbery with a firearm beyond a reasonable doubt. To prove defendant guilty of armed robbery as it was charged here, the prosecution must prove that defendant knowingly took money from the

person or presence of Ms. Ross by the use of force or by threatening the imminent use of force while armed with a firearm. 720 ILCS 5/18-2(a)(2) (West 2008).

¶ 26    It is not the function of the reviewing court to retry defendant when presented with a challenge to the sufficiency of the evidence. *People v. Evans*, 209 Ill. 2d 194, 209 (2004). The relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Under this standard, the trier of fact remains responsible for determining the credibility of the witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence. *People v. Ross*, 229 Ill. 2d 255, 272 (2008).

¶ 27    "A single witness' identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification. [Citations.] This is true even in the presence of contradicting alibi testimony, provided that the witness had an adequate opportunity to view the accused and that the in-court identification is positive and credible." *People v. Slim*, 127 Ill. 2d 302, 307 (1989). "In assessing identification testimony, our courts have generally been using steps set out by the Supreme Court in *Neil v. Biggers* (1972), 409 U.S. 188 ***. There the Court held that circumstances to be considered in evaluating an identification include: (1) the opportunity the victim had to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the victim at the identification confrontation; and (5) the length of time between the crime and the identification confrontation." *Slim*, 127 Ill. 2d at 307-08.

¶ 28    In the present case, Ms. Ross's testimony, coupled with the videotape of the armed robbery, was sufficient to sustain defendant's conviction beyond a reasonable doubt. With respect to the first *Slim/Biggers* factor, Ms. Ross had a good opportunity to view defendant at the time of the crime, as defendant approached her at the front cash register, stood a short distance away and directly in front of her across the counter, and engaged her in conversation regarding the purchase of some lighters. Although defendant was wearing a hat pulled down to his eyes, Ms. Ross testified that when he approached her cash register and purchased the first lighter, she was able to see his face from the middle of his eyes all the way down. Ms. Ross testified that when defendant returned to purchase the second lighter, she again could see his face from the middle of his eyes all the way down. The videotape shows that the lighting in the store was favorable to such an identification.

¶ 29    Defendant contends the "partial view" of his face led Ms. Ross to initially identify two individuals other than defendant, which raises a reasonable doubt as to her opportunity to adequately view the offender at the time of the crime and as to her subsequent identification of defendant as the offender. We disagree. Ms. Ross testified that when she viewed the first photo array at 11:15 p.m. on the evening of the armed robbery, she told the officers that she did not recognize the offender as being any of the persons in the photographs and that she needed to actually "see the person" to make an identification. The officers told her the photographs were old and that the persons depicted therein could have "changed," and they asked her whether one of those persons could possibly be the offender. Ms. Ross stated it "could be" possible, and she identified a photograph of someone whose chin and lips looked

similar to the offender's. Detective Donnelly located that person but did not place him in a lineup.

¶ 30    Ms. Ross testified that when she viewed the second photo array the next evening, she again told the officers she did not recognize the offender. The officers again told her that the photographs were old and that she should consider that the offender had aged since the photographs were taken. Ms. Ross agreed to identify a photograph of a person who "possibl[y]" could have been the offender, with the understanding that she would have the chance to view that person in a lineup. Detective Donnelly testified that he later placed that individual in a lineup but, after viewing the lineup, Ms. Ross did not identify him.

¶ 31    After detectives recovered the clothing worn by the offender and learned that the clothing contained defendant's DNA, Ms. Ross was shown a photo array containing defendant's photograph. Detective Donnelly testified that Ms. Ross immediately identified defendant as the person who robbed the Walgreens. When she viewed a lineup containing defendant, Ms. Ross again immediately identified him.

¶ 32    Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found Ms. Ross clearly indicated to the officers that she was unable to identify the offender from the first two photo arrays and that she picked out photographs of persons who possibly resembled the offender with the understanding that she would make a positive identification only after seeing those persons in a lineup. Ms. Ross did not make an unequivocal, positive identification until she viewed defendant's photo and saw him in a lineup, each time immediately identifying him as the offender. On these facts, no reasonable doubt is raised as to Ms. Ross's opportunity to view defendant at the time of the crime.

¶ 33    With respect to the second factor, Ms. Ross's degree of attention was high, as she testified that her attention was directed to defendant when he approached her and stood too close to the cash register. Ms. Ross's high degree of attention also was demonstrated by her detailed recollection of what defendant did from the moment he entered the Walgreens until he brandished the gun, took the money from the cash register, and fled.

¶ 34    With respect to the third factor, Ms. Ross did not testify to any prior descriptions she gave of defendant.

¶ 35    With respect to the fourth factor, the level of certainty in the identification, Detective Donnelly testified that when he showed Ms. Ross the photo array containing defendant's photograph, she showed no hesitation in identifying him as the offender. Detective Donnelly also testified that when Ms. Ross viewed the lineup containing defendant, she immediately pointed him out as the person who robbed the Walgreens. Defendant argues that Ms. Ross's degree of certainty must be regarded as low because she identified two individuals (other than defendant) immediately after the crime. Defendant's argument fails for the reasons discussed above.

¶ 36    With respect to the fifth factor, the length of time between the crime and the identification of defendant was one year and four months, which, defendant argues, "is a seriously negative factor that weighs heavily against a finding of a reliable identification." We disagree, as identifications made after even a longer period of time have been upheld.

See, *e.g.*, *People v. Rodgers*, 53 Ill. 2d 207, 214 (1972) (identification made two years later).

¶ 37    In sum, weighing all of the *Slim/Biggers* factors, and viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that Ms. Ross viewed defendant under circumstances permitting a positive identification. Also, any rational trier of fact could have found that Ms. Ross's identification testimony was supported by the DNA evidence matching defendant to the jacket, hat, gloves, and doo-rag found in the nearby dumpster, and by the discovery of lighters inside the jacket pocket as testified to by Ms. Ross and depicted in the videotape. As such, Ms. Ross's identification of defendant as the person who brandished a gun and took the money from her cash register, coupled with the DNA evidence, was sufficient to support defendant's conviction of armed robbery with a firearm beyond a reasonable doubt.

¶ 38    Defendant contends the trial court relied on facts not in evidence when finding him guilty. The trial court stated in pertinent part:

"I believe that the defendant went to the Walgreens with the intent to commit a robbery on that date and no attempt at smoke and mirrors and trying to divert the attention away from himself succeeded because of his leaving the items of clothing, four items of clothing all with DNA that came back to him in a major profile of the DNA testing.

I think one of the things that convinced me beyond a reasonable doubt was not only that the DNA on all four items comes back to the defendant, but inside the pocket of the jacket are three lighters. Those three lighters were lighters that were taken from the Walgreens. The lighters that were taken from the Walgreens was in the jacket that was found in the dumpster close to the Walgreens.

The jacket having the DNA of the defendant. That jacket having the gloves with the defendant's DNA. The defendant's hat and doo-rag also. The hat and doo-rag also being in that garbage can and also having the defendant's DNA on it.

That put me to believing that the defendant was guilty beyond a reasonable doubt. But the thing that finalized it for me was Ms. Ross's identification in the photo array and the lineup. So it's this court's finding that the defendant is guilty beyond a reasonable doubt of the offense as charged."

¶ 39    Defendant argues there was no evidence supporting the trial court's finding that the lighters found in the jacket pocket were the same lighters taken from the Walgreens. We disagree. Ms. Ross's testimony and the videotape of the crime established that defendant placed two lighters in his jacket pocket while inside the Walgreens. A jacket matching the description of the one worn by defendant was found in a dumpster near the Walgreens, and the jacket contained three lighters. DNA evidence linked defendant to the jacket. The trial court reasonably could have inferred from all this evidence that two of the lighters found in the jacket pocket were the same two lighters defendant placed into said pocket. Any error with regard to the finding as to the third lighter was harmless, where the other evidence relied on by the trial court, specifically Ms. Ross's identification testimony, Detective Donnelly's testimony regarding her identifications, and the DNA evidence linking defendant to the clothing worn by the offender, supported the finding of guilt. See *People v. Turner*, 282 Ill.

App. 3d 770, 779 (1996) (any error in relying on facts not in evidence was harmless, where the finding was irrelevant to who murdered the victim and where the other evidence established defendant's guilt).

¶ 40       Defendant contends we should reduce his conviction from armed robbery to robbery because the State failed to prove beyond a reasonable doubt that he was armed with a firearm during the offense. Section 2-7.5 of the Code (720 ILCS 5/2-7.5 (West 2008)) provides that the term "firearm" has the meaning ascribed to it in section 1.1 of the Firearm Owners Identification Card Act (430 ILCS 65/1.1 (West 2008)). Section 1.1 of the Firearm Owners Identification Card Act in effect at the time of the offense stated:

> " 'Firearm' means any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas; excluding, however:
>
> (1) any pneumatic gun, spring gun, paint ball gun or B-B gun which either expels a single globular projectile not exceeding .18 inch in diameter and which has a maximum muzzle velocity of less than 700 feet per second or breakable paint balls containing washable marking colors;
>
> (2) any device used exclusively for signalling or safety and required or recommended by the United States Coast Guard or the Interstate Commerce Commission;
>
> (3) any device used exclusively for the firing of stud cartridges, explosive rivets or similar industrial ammunition; and
>
> (4) an antique firearm (other than a machine-gun) which, although designed as a weapon, the Department of State Police finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon."

¶ 41       Defendant argues "there was no evidence that the item in the robber's hand either met the [statutory] definition of firearm or did not fit any of the exceptions. First, the gun was never recovered and the few seconds of video showing the gun were blurry and did not give much detail, making it impossible to examine its physical properties to determine if it qualified as a 'firearm' or if it was a BB or toy gun. *** [Ms.] Ross never described the object as a 'firearm' and the colors of the gun (black or black and silver) provide no basis to distinguish the gun carried by the robber from a BB gun, airsoft gun, or toy gun. Further, [Ms.] Ross did not provide a detailed description of the gun, so there is no way to compare characteristics of the gun with those of a real or toy gun to determine what the object in the offender's hand was. The State also did not introduce any evidence-though it was certainly free to do so-from an expert witness who had viewed the video [and testified] that the object in the robber's hand was a firearm. Additionally, [Ms.] Ross did not testify that the offender threatened to kill her, which might have provided some circumstantial evidence that the weapon was a firearm."

¶ 42       In support of his argument, defendant cites *People v. Ross*, 229 Ill. 2d 255 (2008). In *Ross*, the defendant there was arrested and indicted for armed robbery. *Id.* at 258. Under the armed robbery statute in effect at the time of the offense, a person committed armed robbery

when he committed robbery while armed with a dangerous weapon. See 720 ILCS 5/18-2(a) (West 1998). At trial, the victim testified that, just before midnight on January 18, 1999, he was walking to his home when he encountered defendant. *Ross*, 229 Ill. 2d at 257. Defendant pointed a " 'black, very portable gun' " at his chest and demanded his wallet; the victim complied. *Id.* at 258. The victim further described the gun as " 'small' " and " 'something you can conceal.' " *Id.*

¶ 43     About two minutes later, defendant told the victim he could leave. *Id.* The victim ran away and immediately encountered plainclothes police officers on the next street. *Id.* They drove the victim back to the scene of the robbery, where they found defendant, whom the victim identified as the robber. *Id.* As the officers approached defendant, he threw some items into a bush. *Id.* Upon inspection, the officers discovered the victim's wallet and a pellet gun. *Id.* The State did not offer the gun into evidence, but the officer who recovered the gun described it as a " '4.5 BB caliber gun with a three inch barrel.' " *Id.* The inventory sheet in the record listed the gun as a " 'MARKSMAN PLAINSMAN *** 4.5 BB CAL. PELLET GUN 3 INCH BARREL BLACK IN COLOR,' " but did not mention any pellets. *Id.* The trial court convicted defendant of armed robbery and sentenced him to eight years in prison. *Id.*

¶ 44     Defendant filed a posttrial motion, in which he argued that the State failed to prove beyond a reasonable doubt that the gun was a dangerous weapon. *Id.* The trial court denied the motion, stating:

" '[T]he testimony in the record was that the victim was in fear of his life when he observed what he thought to be a small gun that could be easily concealed. The officers recovered the gun. The victim observed the gun. Everything in the record suggested to this Court that the victim clearly believed it to be a dangerous weapon.' " *Id.* at 258-59.

¶ 45     On appeal, the appellate court held that the State failed to prove beyond a reasonable doubt that the pellet gun used by defendant was a dangerous weapon. *Id.* at 260. The supreme court affirmed, holding:

"[T]he evidence regarding [defendant's] gun was thin. [The victim] testified that the gun was small, portable, and concealable; the police officer testified that the gun was a .177-caliber pellet gun with a three-inch barrel. The State never presented the gun or photographs of the gun at trial. There was no evidence that the gun was loaded, there was no evidence that it was brandished as a bludgeon, and there was no evidence regarding its weight or composition. The trial court incorrectly based its ruling on the subjective feelings of the victim, rather than the objective nature of the gun. The appellate court correctly concluded that the evidence was insufficient to prove that the gun was a dangerous weapon, and correctly directed the trial court to enter a judgment of conviction for simple robbery and sentence [defendant] accordingly." *Id.* at 276-77.

¶ 46     The supreme court recently distinguished *Ross* in *People v. Washington*, 2012 IL 107993. In *Washington*, the State indicted defendant for armed robbery, aggravated kidnapping, and aggravated vehicular hijacking. *Id.* ¶ 5. The State alleged in the indictment that defendant committed each of the offenses " 'while armed with a dangerous weapon, to wit: a firearm.' " *Id.*

¶ 47    At trial, the victim testified he and his cousin made a delivery to a grocery store in Chicago. *Id.* ¶ 10. After making the delivery, the victim sat in the delivery truck waiting for his cousin to return. *Id.* While sitting in the truck, the victim saw defendant coming toward him along the side of the truck. *Id.* The victim started to exit the truck, but defendant pointed a gun at his head and forced him back inside. *Id.* With defendant still holding the gun to his head, the victim was forced to sit on a safe located between the front driver and passenger seats of the truck. *Id.* Defendant's accomplice then entered the truck and began driving. *Id.* Defendant told the victim not to move and continued to point the gun at his head. *Id.*

¶ 48    After driving a few blocks, the driver stopped the truck and defendant forced the victim out of the truck at gunpoint. *Id.* ¶ 11. The victim testified that, while still pointing the gun at him, defendant forced him into the back cargo area of the truck. *Id.* The truck began moving, stopped for a brief time, and began moving again. *Id.* A short time later, the victim heard police sirens. *Id.* Defendant was arrested. *Id.* ¶ 12.

¶ 49    The jury convicted defendant of all the charged offenses. *Id.* ¶ 21. On appeal, the appellate court considered whether the State presented sufficient evidence that defendant committed the offenses while armed with a dangerous weapon. *Id.* ¶ 25. Relying on *Ross*, the appellate court held that the evidence was insufficient to uphold defendant's convictions and remanded the cause to the trial court with instructions to enter judgment and sentences on the lesser-included offenses of kidnapping, vehicular hijacking, and robbery. *Id.*

¶ 50    The supreme court reversed the appellate court. *Id.* ¶ 44. The supreme court noted that, in *Ross*, the evidence indicated that the weapon used was a small BB gun with only a three-inch barrel, and that said BB gun was not a dangerous weapon. *Id.* ¶ 34. Unlike *Ross*, there was no evidence in the case before it that the weapon displayed by defendant was anything other than a "real gun." *Id.* ¶¶ 35, 36. The supreme court held that, viewing the victim's unequivocal testimony and the circumstances under which he was able to see the gun in the light most favorable to the prosecution, any rational trier of fact reasonably could have inferred that defendant possessed a real gun and convicted him of the charged offenses. *Id.* ¶¶ 36-37.

¶ 51    The present case is more similar to *Washington* than to *Ross*. As in *Washington*, and unlike in *Ross*, the only evidence at trial was that defendant was armed with a "real" gun, not a toy gun or BB gun. Specifically, the victim here, Betty Ross, testified that after defendant reached his hand in the cash register drawer, she shut the drawer and turned away. Then she heard a noise, looked back over her shoulder, and saw defendant holding a gun. When asked why she thought it was a gun, Ms. Ross stated, "I seen a whole gun. It was rested on the [counter], his hand was on it, it was black." Ms. Ross further testified:

   "Q. Had you ever seen the gun before?

   A. That was the first one.

   Q. But to you it looked like a gun?

   A. Uh-huh.

   Q. Is that a yes?

   A. Yes."

¶ 52    Ms. Ross's testimony was corroborated by the videotape of the offense, which depicted defendant holding what appears to be an actual gun while robbing the Walgreens, and by the still photograph in which Ms. Ross circled the gun held by defendant. There was no contrary evidence presented that the gun was a toy gun, a BB gun, or anything other than a "real gun." As in *Washington*, viewing Ms. Ross's unequivocal testimony and the circumstances under which she viewed the gun, coupled with the videotape of the offense and still photograph, in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that defendant was armed with a gun that met the statutory definition of firearm and convicted him of armed robbery.

¶ 53    Next, defendant contends the 15-year sentence enhancement for armed robbery with a firearm violates the proportionate penalties clause.

¶ 54    A statute carries a strong presumption of constitutionality. *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). The party challenging the statute bears the burden of clearly establishing that it violates the constitution. *Id.* A reviewing court has "a duty to construe a statute in a manner that upholds its validity and constitutionality if it reasonably can be done." *People v. Graves*, 207 Ill. 2d 478, 482 (2003). The constitutionality of a statute is a matter of law subject to *de novo* review. *Sharpe*, 216 Ill. 2d at 486-87.

¶ 55    The proportionate penalties clause of the Illinois Constitution states: "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Our supreme court has identified two distinct tests to evaluate a proportionality challenge. First, "a penalty violates the proportionate penalties clause if it is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community." *People v. Moss*, 206 Ill. 2d 503, 522 (2003). Second, "the proportionate penalties clause is violated where offenses with identical elements are given different sentences." *Id.* Our supreme court recently abandoned a third method, the "cross-comparison analysis," because it had proven to be "problematic and unworkable." *Sharpe*, 216 Ill. 2d at 519.

¶ 56    In the present case, defendant argues that the 15-year firearm sentencing enhancement at issue here was struck down as an unconstitutional violation of the proportionate penalties clause in *People v. Hauschild*, 226 Ill. 2d 63 (2007). The State counters that the legislature subsequently passed a statutory amendment reviving the sentencing enhancement, and cites *People v. Brown*, 2012 IL App (5th) 100452, and *People v. Williams*, 2012 IL App (1st) 100126, in support. Defendant argues that *Brown* and *Williams* were wrongly decided, and that we should instead follow *People v. Gillespie*, 2012 IL App (4th) 110151, which held that the statutory amendment did not revive the sentencing enhancement, which remains unconstitutional and void *ab initio* pursuant to *Hauschild*. *Gillespie* relied on two earlier supreme court cases, *People v. Wagner*, 89 Ill. 2d 308 (1982), and *People v. Manuel*, 94 Ill. 2d 242 (1983), in support of its holding.

¶ 57    Resolution of defendant's proportionate penalties argument requires us to consider *Wagner*, *Manuel*, *People v. Lewis*, 175 Ill. 2d 412 (1996), *Hauschild*, *Brown*, *Williams* and *Gillespie*. We proceed to discuss these cases in chronological order.

¶ 59    In *Wagner*, the trial court convicted the defendant there of violating section 404 of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1977, ch. 56½, ¶ 1404) for delivering a substance represented to be heroin (but which was not heroin). *Wagner*, 89 Ill. 2d at 310. The supreme court reversed the conviction, because section 404 punished the delivery of a noncontrolled substance represented to be a controlled substance as a Class 3 felony whereas sections 401(e) and (f) of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1977, ch. 56½, ¶ 1401(e), (f)) punished the delivery of an actual schedule IV or V controlled substance less severely, as a Class 4 felony. *Wagner*, 89 Ill. 2d at 313. The supreme court held "the delivery of a controlled substance represents a greater threat to the public than the delivery of a noncontrolled harmless substance," and yet, "the less serious threat to the public carries a harsher punishment than the greater threat." *Id.* The supreme court concluded "[s]ection 404 is not reasonably designed to remedy the evil which the legislature determined to be a greater threat to the public" and, therefore, section 404 violates the due process clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). *Wagner*, 89 Ill. 2d at 313.

¶ 60    The supreme court recognized that the legislature recently had passed Public Act 81-583 (eff. Sept. 14, 1979) amending sections 401(e) and (f) to make the delivery of a schedule IV or V controlled substance a Class 3 felony, like the delivery of a noncontrolled substance under section 404. *Wagner*, 89 Ill. 2d at 310. However, this amendment was inapplicable to defendant, because the amendment went into effect after his violation of section 404. *Id.*

¶ 61                                          2. *Manuel*

¶ 62    In *Manuel*, the defendants there were charged with violating section 404 of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1979, ch. 56½, ¶ 1404), the statute criminalizing the delivery of a noncontrolled substance represented to be a controlled substance. *Manuel*, 94 Ill. 2d at 243. The trial court dismissed the charges because the supreme court in *Wagner* had held section 404 to be unconstitutional. *Id.*

¶ 63    The State appealed, arguing that the trial court erred in dismissing the charges, and that *Wagner* did not apply, because defendants violated section 404 *after* the effective date of Public Act 81-583. *Id.* at 244. The supreme court disagreed, noting that Public Act 81-583 had amended only sections 401 and 402 of the Illinois Controlled Substances Act but had *not* amended section 404, under which defendants had been charged. *Id.* The supreme court held it "cannot agree that the amendment to sections 401 and 402 can operate to, in essence, revive a different statute which this court subsequently holds unconstitutional." *Id.* Because Public Act 81-583 amended sections 401 and 402 but not section 404, *Wagner*'s holding that section 404 was unconstitutional remained in effect, rendering the statute void *ab initio*. *Id.* at 244-45. Since the defendants could not be prosecuted under an unconstitutional act, the supreme court affirmed the trial court's dismissal of the charges. *Id.* at 245.

¶ 64                                          3. *Lewis*

¶ 65    In *Lewis*, the defendant there was charged with armed robbery while armed with a dangerous weapon, a handgun, a Class X offense which at the time was punishable by an

unextended-term sentence ranging from 6 to 30 years in prison. *Lewis*, 175 Ill. 2d at 418. Defendant also was charged with armed violence predicated on robbery committed with a category I weapon, a handgun (*id.* at 414), a Class X offense punishable by an unextended-term sentence ranging from 15 to 30 years in prison (*id.* at 418). The supreme court noted that the two offenses were "substantively identical" yet, "illogically, are punished with disparate penalties" in that armed violence predicated on robbery with a category I weapon carried a greater minimum prison term than armed robbery while armed with a handgun. *Id.* Accordingly, the supreme court held that "the penalty for armed violence predicated on robbery committed with a category I weapon violates the proportionate penalties clause" (*id.*) and therefore that the State's Attorney "had no authority to charge that offense" (*id.* at 423). The supreme court affirmed the dismissal of the armed violence count. *Id.* at 423-24.

¶ 66                                4. Public Act 91-404

¶ 67         Subsequent to *Lewis*, the legislature enacted Public Act 91-404, the stated purpose of which was "to deter the use of firearms in the commission of a felony offense." Pub. Act 91-404, § 5 (eff. Jan. 1, 2000) (codified at 720 ILCS 5/33A-1(b)(1) (West 2000)). To accomplish this purpose, the legislature increased the penalties for certain felonies, including armed robbery, when the defendant possesses or uses a firearm during the commission of the offense. See 720 ILCS 5/18-2(b) (West 2000). Specifically, the legislature provided that a person who commits armed robbery while armed with a firearm shall have 15 years added to the term of imprisonment; a person who commits armed robbery while personally discharging a firearm during the commission of the offense shall have 20 years added to the term of imprisonment; and a person who commits armed robbery while personally discharging a firearm during the commission of the offense that proximately causes great bodily harm, permanent disability, permanent disfigurement, or death to another person shall have 25 years or up to a term of natural life added to the term of imprisonment. See 720 ILCS 5/18-2(b) (West 2000). These additional penalties are commonly known as the "15/20/25-to-life" sentencing provisions. *Hauschild*, 226 Ill. 2d at 72. Public Act 91-404 also amended the armed violence statute, which prior thereto read, "A person commits armed violence when, while armed with a dangerous weapon, he commits any felony defined by Illinois Law." 720 ILCS 5/33A-2 (West 1998). In pertinent part, Public Act 91-404 created subsections (a), (b), and (c) of the armed violence statute. Subsection (a) provided that a person commits armed violence when, while armed with a dangerous weapon, he commits certain felonies. See 720 ILCS 5/33A-2(a) (West 2000). Subsection (b) provided that a person commits armed violence when he personally discharges a firearm that is a category I or category II weapon while committing certain felonies. See 720 ILCS 5/33A-2(b) (West 2000). Subsection (c) provided that a person commits armed violence when he personally discharges a firearm that is a category I or category II weapon that proximately causes great bodily harm, permanent disability, or permanent disfigurement or death to another person while committing certain felonies. See 720 ILCS 5/33A-2(c) (West 2000).

¶ 68                                    5. *Hauschild*

¶ 69        In *Hauschild*, the defendant there was convicted of attempted murder, armed robbery
while armed with a firearm and home invasion. *Hauschild*, 226 Ill. 2d at 69. On appeal,
defendant argued in pertinent part that his armed robbery conviction should be reversed
because the penalty for committing armed robbery with a firearm was unconstitutionally
disproportionate to the penalty for the equivalent offense of armed violence predicated on
robbery with a category I or category II weapon. *Id.* at 82. The appellate court found that
"because the *Lewis* court determined that the penalty for armed violence predicated on
robbery was unconstitutionally disproportionate to the penalty for armed robbery, the offense
of armed violence 'ceased to exist' after *Lewis*, so that it could not be used as a basis to
conduct a proportionate penalties analysis." *Id.* at 84.

¶ 70        The supreme court disagreed, holding that the legislature's enactment of Public Act 91-
404 subsequent to *Lewis* had " 'revived' the offense of armed violence predicated on robbery
when it amended the sentence for certain armed robberies to add the 15/20/25-to-life
provisions, creating more severe penalties for those offenses than for armed violence
predicated on robbery." *Id.* The supreme court held that "because the penalty for armed
robbery while armed with a firearm [citation] is now greater than the penalty for armed
violence predicated on robbery with a category I or category II weapon [citation], the holding
in *Lewis* cannot be used as a basis to preclude comparison of the 'revived' armed violence
offense to armed robbery while armed with a firearm for purposes of proportionality review."
*Id.* at 84-85.

¶ 71        Having found that armed robbery with a firearm and armed violence predicated on
robbery with a category I or category II weapon were comparable, the supreme court
proceeded to compare the two offenses and found they had identical elements. *Id.* at 86. The
supreme court then compared the penalties for the two offenses and noted that armed robbery
while armed with a firearm was a Class X felony carrying a 6- to 30-year term of
imprisonment, "with a mandatory 'add-on penalty' of 15 years, making the possible sentence
for armed robbery while armed with a firearm 21 to 45 years (720 ILCS 5/18-2(a)(2), (b)
(West 2000))." *Id.* By contrast, armed violence predicated on robbery with a category I or
category II weapon was "a Class X felony punishable by a sentence ranging from 15 to 30
years (720 ILCS 5/33A-3(a) (West 2000))." *Id.* The supreme court concluded "defendant's
sentence for armed robbery while armed with a firearm [citation] violates the proportionate
penalties clause because the penalty for that offense is more severe than the penalty for the
identical offense of armed violence predicated on robbery with a category I or category II
weapon." *Id.* at 86-87.

¶ 72        "In a word, Public Act 91-404 substituted one proportionate-penalties problem for
another. Before the enactment of Public Act 91-404, the penalty for armed violence
predicated on robbery with a category I weapon [citation] violated the proportionate-penalties
clause because the penalty for that offense was more severe than the penalty for the identical
offense of armed robbery while armed with a firearm [citation]. [Citation.] Instead of
eliminating the disparity, Public Act 91-404 switched it around. After the enactment of
Public Act 91-404, armed robbery while armed with a firearm [citation] now carried a
steeper penalty than armed violence predicated on robbery with a category I or category II

weapon [citation], thereby violating the proportionate-penalties clause again. [Citation.]"
*Gillespie*, 2012 IL App (4th) 110151, ¶ 45 (citing *Hauschild*, 226 Ill. 2d at 86-87).

¶ 73                                6. Public Act 95-688

¶ 74    Subsequent to *Hauschild*, the legislature enacted Public Act 95-688 (Pub. Act 95-688, § 4 (eff. Oct. 23, 2007)), which eliminated the offense of armed violence predicated on robbery with a category I or category II weapon.

¶ 75                                      7. *Brown*

¶ 76    In *Brown*, defendant there was convicted of armed robbery with a firearm and the trial court sentenced him to 22 years' imprisonment, including the 15-year sentence enhancement pursuant to section 18-2(b) of the Code. *Brown*, 2012 IL App (5th) 100452, ¶ 1. On appeal, defendant argued the 15-year sentence enhancement was inapplicable because the supreme court in *Hauschild* held that said enhancement violated the proportionate penalties clause by making the penalty for armed robbery with a firearm more severe than the penalty for the identical offense of armed violence predicated on robbery with a category I or category II weapon. *Id.* ¶¶ 6, 8.

¶ 77    The Fifth District Appellate Court (hereinafter the *Brown* court) disagreed, noting that on October 23, 2007, approximately four months after the supreme court decision in *Hauschild*, the legislature "effectively cured the proportionate-penalties violation" by enacting Public Act 95-688 (Pub. Act 95-688, § 4 (eff. Oct. 23, 2007)), which eliminated the offense of armed violence predicated on robbery with a category I or category II weapon. *Brown*, 2012 IL App (5th) 100452, ¶¶ 9, 12. The *Brown* court also noted:

    "Additionally, the legislative history behind the implementation of the amendment indicates the legislature intended this result when it adopted Public Act 95-688. During the July 26, 2007, Senate proceeding where the amendment was passed, Senator Cullerton noted a recent supreme court case held that the 15-year sentence enhancement for armed robbery with a firearm violated the proportionate-penalties clause, and the amendment to the armed-violence statute 'avoid[ed] any further disproportionate penalty challenges to the statute that may arise.' 95th Ill. Gen. Assem., Senate Proceedings, July 26, 2007, at 8-9 (statements of Senator Cullerton)." *Id.* ¶ 13.

¶ 78    The defendant in *Brown* argued, though, that the supreme court in *Hauschild* had declared the armed robbery statute void *ab initio* prior to the enactment of Public Act 95-688, meaning that the armed robbery statute should be considered as if it never existed to be validated by the amendment to the armed violence statute. *Id.* ¶ 14. The *Brown* court disagreed, noting the State's argument that the supreme court in *Hauschild* never specifically ruled that the 15-year sentence enhancement was "void *ab initio*." *Id.* ¶ 15. The *Brown* court also noted the similarity between the legislature's enactment of Public Act 95-688 subsequent to *Hauschild*, and the legislature's enactment of the 15/20/25-to-life sentencing provisions of Public Act 91-404 subsequent to *Lewis*. *Id.* ¶¶ 15-16. *Brown* noted that in *Hauschild*, the supreme court had held that the legislature's enactment of the 15/20/25-to-life sentencing provisions for certain armed robberies had "revived" the offense of armed

-17-

violence predicated on robbery held unconstitutional by *Lewis*. *Id.* ¶ 15. The *Brown* court held:

> "Similarly, Public Act 95-688 'revived' the sentencing scheme in the armed-robbery statute by fixing the proportionate-penalties violation. As previously stated, it is no longer possible for armed violence to be predicated on robbery under section 33A-2(a) of the Criminal Code (720 ILCS 5/33A-2(a) (West 2008)). The 15-year sentence enhancement under the armed-robbery statute violated the proportionate-penalties clause because armed robbery contained identical elements but carried a more severe penalty than the offense of armed violence predicated on robbery. The legislature cured this proportionate-penalties violation by removing the impediment to the sentence enhancement's enforcement, *i.e.*, the offense of armed violence predicated on robbery." *Brown*, 2012 IL App (5th) 100452, ¶ 16.

¶ 79    The *Brown* court concluded that since the legislature had revived the 15-year sentencing enhancement in the armed-robbery statute by enacting Public Act 95-688, the trial court had correctly applied the sentence enhancement against defendant at sentencing. *Id.* ¶ 17.

¶ 80                                    8. *Williams*

¶ 81    In *Williams*, the defendant there was convicted of armed robbery, aggravated vehicular hijacking and aggravated battery. *Williams*, 2012 IL App (1st) 100126, ¶ 1. In pertinent part, defendant's sentence for the armed robbery included a 15-year firearm sentencing enhancement under section 18-2(b) of the Code. *Id.* ¶ 45. On appeal, defendant argued that the 15-year sentencing enhancement was declared unconstitutional and void *ab initio* pursuant to *Hauschild*. *Id.* ¶ 46. Defendant further argued that Public Act 95-688 did not revive the 15-year sentencing enhancement and, therefore, that his sentence for armed robbery should be vacated and the cause remanded for resentencing under the sentencing provision that predated the invalid statute. *Id.*

¶ 82    The First District Appellate Court (hereinafter the *Williams* court) disagreed, noting that the *Brown* court "rejected the exact argument proposed by the defendant here, specifically, that the legislature's 2007 amendment did not 'revive' the 15-year sentencing enhancement[] for the armed robbery *** statute. In *Brown*, the court expressly stated that the legislature had revived the 15-year firearm sentencing enhancement[] by enacting Public Act 95-688. [Citation.]" *Id.* ¶ 55. The *Williams* court agreed with *Brown* that Public Act 95-688 "removed the constitutional violation of the proportionate penalties clause regarding armed robbery" (*id.*) and "cured" the proportionate penalties clause violation (*id.* ¶ 52). However, notwithstanding Public Act 95-688's revival of the 15-year firearm sentencing enhancement, the *Williams* court held that defendant's sentence must be vacated and the cause remanded for resentencing because he committed his crimes *after Hauschild* was decided but *before* Public Act 95-688 became effective. *Id.* ¶ 56.

¶ 83                                    9. *Gillespie*

¶ 84    In *Gillespie*, the jury convicted the defendant there of two counts of armed robbery, for which the trial court sentenced him to 2 concurrent terms of 40 years' imprisonment.

*Gillespie*, 2012 IL App (4th) 110151, ¶ 1. Each of his prison terms included the 15-year firearm sentencing enhancement. *Id.* On appeal, defendant argued that the statute authorizing the sentencing enhancements was void *ab initio* by reason of its violation of the proportionate-penalties clause. *Id.* ¶ 2. In analyzing the issue, the Fourth District Appellate Court (hereinafter the *Gillespie* court) discussed the supreme court's opinion in *Hauschild* that held that "the penalty for armed robbery while armed with a firearm [citation] violated the proportionate-penalties clause, because the penalty for that offense was more severe than the penalty for the identical offense of armed violence predicated on robbery with a category I or category II weapon [citation]." *Id.* ¶ 44. The *Gillespie* court also discussed the Fifth District Appellate Court's holding in *Brown*, that the legislature's enactment of Public Act 95-688, subsequent to *Hauschild*, "had eliminated the offense of armed violence predicated on robbery, and hence armed robbery and armed violence no longer could have identical elements for purposes of the proportionate-penalties clause." *Id.* ¶ 50. The State asked the *Gillespie* court to follow *Brown*'s holding that Public Act 95-688 had revived the 15-year sentencing enhancement in the armed robbery statute. *Id.* ¶ 52.

¶ 85        The *Gillespie* court declined to follow *Brown*, finding its reasoning flawed. The *Gillespie* court noted that *Brown* "reasoned that just as the supreme court held, in *Hauschild*, 226 Ill. 2d at 84, that Public Act 91-404 had ' "revived" the offense of armed violence predicated on robbery held unconstitutional by *Lewis*,' so had Public Act 95-688 'revived' the 15-year enhancement in the armed robbery statute." *Gillespie*, 2012 IL App (4th) 110151, ¶ 51. The *Gillespie* court held that *Brown*'s reasoning "suffers from a fatal flaw: Public Act 95-688 is not truly comparable to Public Act 91-404. Public Act 91-404 amended *both* the armed-robbery statute and the armed-violence statute [citation], whereas Public Act 95-688 amended the armed-violence statute while leaving the armed-robbery statute unchanged." (Emphasis in original.) *Id.* ¶ 52.

¶ 86        The *Gillespie* court held that Public Act 95-688's amendment of the armed-violence statute did not revive the sentencing enhancement in the armed robbery statute. *Id.* In so holding, the *Gillespie* court relied on the supreme court's holding in *Manuel* that the amendment of one statute does not revive a different statute that is void *ab initio* by reason of its unconstitutionality. *Id.* The *Gillespie* court concluded:

        "In summary then, section 5 of Public Act 91-404 violated the proportionate-penalties clause by amending subsection (b) of the armed-robbery statute so as to enhance, by 15 years, the penalty for armed robbery while armed with a firearm [citation]; hence, that amendment of subsection (b) was void *ab initio*, as if the amendment were never passed [citations]. Given this voidness of the 15-year enhancement from the start, we disagree with *Brown* that Public Act 95-688 fixed the problem. *Brown* erroneously concludes that the amendment of the armed-violence statute by Public Act 95-688 validated the 15-year enhancement in a different statute, the armed-robbery statute. The fallacy of that conclusion lies in its assumption that the 15-year enhancement *existed* so as to be validated by the amendment of the armed-violence statute." (Emphasis in original.) *Id.* ¶ 54.

¶ 87         In the present case, defendant asks us to follow *Gillespie* instead of *Brown* and hold that Public Act 95-688, which amended the armed violence statute, did *not* revive the sentencing

enhancement in the armed robbery statute which had been held unconstitutional under *Hauschild*. Defendant argues that the sentencing enhancement in the armed robbery statute remains unconstitutional under *Hauschild* and, thus, the 15-year enhancement imposed on him is void.

¶ 88    We decline to follow *Gillespie*, as its reliance on *Manuel* in support of its holding was misplaced. In *Manuel*, the defendants there were charged with violating section 404 of the Illinois Controlled Substances Act, which the supreme court earlier had held (*Manuel*, 94 Ill. 2d at 243), in *Wagner*, to be unconstitutional because it punished delivery of a noncontrolled substance more harshly than the punishment imposed under section 401 for delivery of an actual controlled substance. *Wagner*, 89 Ill. 2d at 313. *Prior* to the supreme court decision in *Wagner*, the legislature had amended sections 401 and 402 to remedy an unconstitutional penalty disparity between delivery and possession of the same type of controlled substance. See *People v. Bradley*, 79 Ill. 2d 410, 418 (1980). The "fortuitous effect" of the amendment to sections 401 and 402 was also to remedy the unconstitutional penalty disparity between delivery of a noncontrolled substance and delivery of a controlled substance addressed in *Wagner*. *Manuel*, 94 Ill. 2d at 244. In finding section 404 to be unconstitutional, the supreme court in *Wagner* did not discuss the amendment to sections 401 and 402 because it went into effect after defendant's violation of section 404. In *Manuel*, the State argued that, contrary to *Wagner*, the amendment to sections 401 and 402 was applicable to the defendants, and served to revive section 404, because defendants violated section 404 after the effective date of the amendment. *Id.* The supreme court in *Manuel* disagreed with the State's argument that the amendment to sections 401 and 402 revived section 404, which had been held unconstitutional in *Wagner*. *Id.* The supreme court noted that the legislative amendment to sections 401 and 402 *preceded* the *Wagner* decision finding section 404 unconstitutional; section 404 still was in force and in effect at the time of the legislative amendment to sections 401 and 402 and not in need of being "revived." Specifically, the *Manuel* court held that it "cannot agree that the amendment to sections 401 and 402 can operate to, in essence, revive a different statute [section 404] which this court *subsequently* holds unconstitutional." (Emphasis added.) *Id.* In other words, the legislature could not have intended to revive section 404 when it amended sections 401 and 402, as section 404 had not yet been declared unconstitutional at the time the amendment was enacted.

¶ 89    In the present case, in contrast to *Manuel*, the legislature enacted Public Act 95-688, amending the armed violence statute, *subsequent* to the supreme court's decision in *Hauschild* holding that the penalty for committing armed robbery with a firearm was unconstitutionally disproportionate to the penalty for armed violence predicated on robbery with a category I or category II weapon. The legislative history makes clear that in order to remedy the constitutional violation, and restore the penalty provision of the armed robbery statute struck down in *Hauschild*, the legislature enacted Public Act 95-688 to eliminate the offense of armed violence predicated on robbery with a category I or category II weapon. See 95th Ill. Gen. Assem., Senate Proceedings, July 26, 2007, at 8-9 (statements of Senator Cullerton). By eliminating the offense of armed violence predicated on robbery with a category I or category II weapon, armed robbery and armed violence no longer could have identical elements for purposes of the proportionate-penalties clause.

¶ 90        The *Brown* court correctly noted that the legislature's subsequent enactment of Public Act 95-688 to amend the armed violence statute in response to the supreme court decision in *Hauschild* was similar to the legislature's enactment of Public Act 91-404 to amend the armed robbery statute subsequent to the supreme court decision in *Lewis*. The *Lewis* court had found the penalty for the offense of armed violence predicated on robbery with a category I weapon to be unconstitutional as it carried a greater minimum prison term than the substantively identical offense of armed robbery while armed with a handgun. *Lewis*, 175 Ill. 2d at 418. Subsequent to *Lewis*, the legislature enacted Public Act 91-404 adding the 15/20/25-to-life sentencing provisions that increased the penalties for armed robbery. The *Hauschild* court held that Public Act 91-404 " '*revived*' the offense of armed violence predicated on robbery when it amended the sentence for certain armed robberies to add the 15/20/25-to-life provisions." (Emphasis added.) *Hauschild*, 226 Ill. 2d at 84. *Hauschild* further held that after the enactment of Public Act 91-404, armed robbery while armed with a firearm now carried a steeper penalty than armed violence predicated on robbery with a category I or category II weapon, thereby violating the proportionate penalties clause again. *Id.* at 86-87. In response to *Hauschild*, the legislature enacted Public Act 95-688 eliminating the offense of armed violence predicated on robbery with a category I or category II weapon, thereby removing the constitutional violation of the proportionate penalties clause. We agree with *Brown* that, just as the enactment of Public Act 91-404 in response to *Lewis* had revived the offense of armed violence predicated on robbery, so the enactment of Public Act 95-688 in response to *Hauschild* revived the 15-year sentencing enhancement for armed robbery with a firearm. Accordingly, the trial court here did not err in applying the 15-year sentencing enhancement to defendant.

¶ 91        For the foregoing reasons, we affirm the trial court.

¶ 92        Affirmed.