2021 IL App (1st) 192195-U

No. 1-19-2195

Order filed December 16, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 16804 |
| | ) | |
| SWONN HERRON, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Reyes and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1     *Held*:  We affirm defendant's conviction for first degree murder over his contention that the State failed to prove him guilty beyond a reasonable doubt.

¶ 2     Following a jury trial, defendant Swonn Herron was found guilty of first degree murder

(720 ILCS 5/9-1(a)(1) (West 2014)) and sentenced to 51 years' imprisonment. On appeal,

defendant contends the State failed to prove his guilt where three eyewitnesses made unreliable identifications under difficult circumstances. We affirm.[1]

¶ 3    Defendant was charged by indictment with first degree murder for allegedly shooting and killing Corey Strothers.[2]

¶ 4    At trial, Sharetta Strothers testified that in the evening of December 22, 2015, she drove with her brothers Corey and Sammie to her mother's house on the 5900 block of South Princeton Avenue in Chicago. The lighting was "perfect" due to streetlights and the house's porch light. Sharetta parked behind the vehicle of her sister, Brianna Young. While Sharetta bent to tie her shoe near her driver side door, another vehicle parked behind her. That vehicle "got [her] attention," and its headlights provided more lighting in the area.

¶ 5    Defendant, whom Sharetta identified in court, emerged from the vehicle, and approached Corey, who stood about five feet from Sharetta, on the curb near the rear passenger side of Young's vehicle. Defendant pointed a handgun at Corey and said, "[d]on't f*** move." Sharetta pleaded with defendant to not shoot Corey, but defendant fired one shot and hit Corey. Corey fell to the ground and defendant reentered the vehicle. Sharetta looked at defendant's face and his clothing, which included a hooded gray jump suit and white sneakers. The hood was raised but did not cover defendant's face, which she saw for "a minute." Sharetta was not focused on anything else.

¶ 6    The vehicle that defendant entered traveled south on Princeton and turned right toward the expressway. Sharetta identified a photograph of the scene including the two parked vehicles, and

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2] Corey Strothers shares the same last name as witness Sharetta Strothers. Accordingly, we will refer to them by their first names.

marked where she, Corey, and defendant stood. These photographs are in the record on appeal and depict a scene marked by police tape with two vehicles parked on a curb, near an illuminated streetlight.

¶ 7     Corey was transported to Stroger Hospital, where Sharetta met detectives and described the shooter as "caramel with a gray jogging suit and white sneakers." The State then asked Sharetta if she saw photographs of the incident "sometime in the next day or two." Sharetta stated she saw photographs in an article on Facebook. The following colloquy occurred:

"Q. In those photos, did you see anybody's face ***?

A. The photos of the article?

Q. Yeah, did you see anybody's face on those Facebook photos?

A. None that I was too aware of."

¶ 8     On December 29, 2015, Sharetta met a different detective at Stroger Hospital, signed an advisory form, and viewed a photo array. Sharetta identified defendant as the shooter with "100 percent" certainty, and at that time, circled his photograph, initialed it, and wrote, "[h]e didn't have any facial hair, I think it's the guy." Sharetta meant that she "looked past" the facial hair to identify defendant and she was "for sure and certain" of his identity because she still remembered his face. She identified the advisory form and photo array at trial and understood she did not have to make an identification. These forms are included in the record on appeal.

¶ 9     On October 28, 2016, Sharetta testified before the grand jury and identified a photograph of defendant and copies of the signed advisory form and photo array.

¶ 10     On cross-examination, Sharetta stated the incident occurred near 9 p.m. and it was dark. Young and her boyfriend, Willie Logan, were inside their vehicle with their children in the back

seat. Sharetta was using her cell phone and placed it in the crook of her neck when she bent to tie her shoe. Sharetta stood when the other vehicle stopped behind hers. Its headlights were illuminated and "[r]ight where [she] was standing." Defendant exited the passenger side and walked to Corey, who was behind Sharetta's vehicle. Defendant raised the firearm and pointed it at Corey. Sharetta watched the firearm, a "black and gray" handgun, but did not recall which hand defendant used. She also did not recall details about defendant's vehicle, but knew it was a "dark color." Sharetta feared for her and her siblings' lives. That evening, Sharetta told police that the shooter was a black man, approximately "5'9" to 6 feet tall" with a "short afro" and thin build.

¶ 11 Sharetta agreed that some time prior to viewing the photo array on December 29, 2015, she saw defendant's photograph "in an article." Sharetta did not recall testifying before the grand jury that she did not see what side of the vehicle the shooter exited. At that time, she also testified that she did not see defendant return to the vehicle.

¶ 12 On redirect examination, Sharetta testified that she identified defendant based on seeing his face during the incident and was "100 percent sure" the person she identified in court was the same person she saw on December 22, 2015. Her fear during the incident did not affect her ability to see defendant's face.

¶ 13 On recross-examination, defense counsel showed Sharetta a street map marked with her mother's address. On the map, Sharetta marked the route she saw the vehicle travel before turning right at the light. The map is included in the record on appeal, and the route she marked is directed northbound.

¶ 14 Young testified that on December 22, 2015, she lived with her mother on the 5900 block of South Princeton. At approximately 9:40 p.m., she was outside the house speaking with her

siblings, Sammie, Sharetta, and Corey. Young kneeled by the driver's seat of her vehicle, facing the back window, and searching for her phone in the back seat, while Logan sat in the passenger seat. Their two children were also in the vehicle. Corey was near the back passenger side of Young's vehicle, and Sharetta was beside her vehicle, which was parked behind Young.

¶ 15    Someone said, "[d]on't f*** move," so Young looked up and saw defendant, whom she identified in court, holding a firearm to Corey's face. Streetlights illuminated the area and Young clearly saw defendant's face and upper body, with nothing blocking her view. She focused on defendant, who faced her and wore a gray sweatshirt. Young demonstrated how defendant held the firearm, which the State described as Young raising "her right hand shoulder height straight out." She saw the flash from the firearm, Corey fall, and defendant walk backward with his face still visible into the vehicle, which drove north on Princeton and turned right onto 59th Street.

¶ 16    Young described the shooter to police as "lighter complected" than her and wearing a gray jogging suit. On December 29, 2015, Young signed an advisory form at the hospital and viewed a photo array. She identified defendant as the shooter and testified that on that date, she was "100 percent certain." Young identified the signed advisory form and lineup, on which she had circled the person she identified and written, "shooter." These forms are included in the record on appeal.

¶ 17    On October 27, 2016, Young testified before a grand jury and identified a photograph of the shooter, the signed photo array, and the advisory form. At that time, Young was "still 100 percent sure" that defendant was the shooter.

¶ 18    On cross-examination, Young stated that she and Logan were searching for her phone with their two children secured in the back seat. From her vantage point, she saw defendant

approximately two feet from Corey. She agreed with counsel's assessment that the experience was "[o]ne of the scariest moments" of her life and happened very quickly, "almost a minute or two." Young denied previously saying she heard several shots and did not recall testifying before the grand jury that she heard six shots. The firearm was "black with silver down the handle." Young did not see the vehicle arrive or defendant exit, but when she noticed the vehicle, she noted its headlights were not illuminated and did not activate until the vehicle left.

¶ 19    Logan testified that on December 22, 2015, he and Young went to her mother's house with their two children. As Logan cleaned the back seat of their vehicle, he heard a male voice he did not recognize and Sharetta scream, "[p]lease don't shoot him." Logan heard a gunshot from behind him, turned, and saw Corey fall. Another man stood approximately five feet from Logan. Logan focused on Corey and the man, looked at the man directly, and saw his face as he backed toward a vehicle. The man entered the vehicle, which drove "right past" Logan, north toward the expressway. Logan identified the man in court as defendant. He described the man to police as a "[d]ark male *** probably five-eight, five-seven."

¶ 20    On January 9, 2016, Logan viewed a photo array and signed an advisory form. He identified the signed form and photo array on which he circled and initialed the shooter. Logan also signed the array and wrote, "[h]e jumped out the car and shot one time." On the advisory form, Logan wrote, "[h]e opened the door, walked to Corey, said something, shot one time, and backed away." The documents are included in the record on appeal. Logan stated that on that date, he was "pretty certain" that the man in the photo array was the shooter.

¶ 21    Later that evening, Logan provided a video statement at the police station and identified a photograph of defendant. Logan was "certain 100 percent" that the man in the photograph was the

shooter. On January 28, 2016, Logan testified before a grand jury, and identified defendant as the shooter in photographs. At trial, Logan identified photographs of the scene and marked the locations of himself, Corey, and the shooter. These photographs are included in the record on appeal.

¶ 22    On cross-examination, Logan affirmed that during the initial photo identification, he said he was "pretty certain," but at trial, he was "100 percent certain," which meant the "same thing." Logan did not know where Young was during the shooting, but knew his children were in the backseat and worried for their safety. Logan saw "something" in one of the shooter's hands but did not know which hand or what the item was. On redirect examination, Logan testified that seeing Corey shot was upsetting, but did not affect his ability to identify the shooter.

¶ 23    Chicago police officer Maria Marquez testified that she arrived on the scene and saw Corey unconscious and bleeding with family members and other officers present. On cross-examination, Marquez stated that she did not see a black vehicle fleeing or hear gunshots.

¶ 24    Chicago police officer William Jackson testified that he photographed the scene and identified photographs that are included in the record on appeal, which depict a sidewalk and curb at night, two vehicles, a residence, and blood and discarded personal effects on the ground. Streetlights are visible on the photographs. On cross-examination, Jackson stated that he used a flash because it was night and otherwise the photo would be "very dim."

¶ 25    Detective Marc Delfavero testified that on December 22, 2015, he went to Stroger Hospital where Corey was in "extremely critical condition." Delfavero spoke with Corey's family and then traveled to the crime scene on the 5900 block of South Princeton, which was "very well lit" by the streetlights and houselights.

¶ 26    Delfavero compiled the photo array containing defendant's photograph and gave it to Detective Donna Walsh on December 29, 2015, with instructions to speak with witnesses at Stroger Hospital. Delfavero met with Walsh later that day and she returned the completed advisory forms and photo arrays, which he identified at trial. Delfavero also identified the photo array he compiled for Logan, which he gave to Detective Anthony Granat to administer. On August 26, 2016, Delfavero learned Corey had died from his injuries.

¶ 27    Walsh testified that she met with Sharetta and Young at Stroger Hospital on December 29, 2015, and separated them to view the photo arrays. Both Sharetta and Young stated that they understood the advisory forms, did not consent to being video or audio recorded, and signed the forms. Sharetta identified an individual, circled the picture, and wrote, "[h]e didn't have any facial hair. I think it's the guy shooter [*sic*] Corey." Walsh also annotated the advisory form with that information. Young identified an individual, circled the photograph, and wrote, "shooter."

¶ 28    Granat testified that on January 9, 2016, he showed Logan a photo array. Logan did not consent to being video or audio recorded and signed the advisory form. Logan identified an individual, circled it, and wrote, "[h]e jumped out of the car and shot one time." Granat identified the photo array Logan viewed and the advisory form.

¶ 29    The State entered a stipulation that Dr. Robert Needleman treated Corey for gunshot wounds to the neck and face at Stroger Hospital on December 22, 2015. Corey was placed on advanced cardiac life support but suffered from "anoxic brain injury caused by loss of oxygen to the brain" and a spinal cord injury causing quadriplegia. Ultimately, Corey was diagnosed with septic shock and brain damage, taken off life support, and pronounced dead on August 26, 2016.

¶ 30    Dr. Marta Helenowski, an assistant medical examiner, testified that she performed Corey's autopsy and determined the cause of death to be complications from a gunshot wound to the neck, and the manner of death to be homicide.

¶ 31    The defense called Dr. Geoffrey Loftus, who testified as an expert in human perception and memory. According to Dr. Loftus, people experience "bits and pieces of information from events" in "a jumbled fashion," which, over time, "cohere together." Memories change whenever a person recalls an event, and witnesses may testify as to inaccurate memories without deliberately misrepresenting their memory or lying.

¶ 32    Factors affecting perception and memory include the quality of the lighting, the distance from the event, and the degree of attention or stress the witness is experiencing. Research has found that people tend to focus on firearms or other things relevant to their safety, not on the appearance of the person wielding the firearm. Mental functioning is further impacted by extremely high stress, but also diminishes under low stress. Further, if a crime lasts a short period of time, a witness may only remember a small portion of it. Dr. Loftus opined that streetlights are typically too dim and far apart to help people "see what anything, including a person, looks like compared to being outside during the day."

¶ 33    According to Dr. Loftus, photo arrays evince bias when the witness is more inclined to choose one individual from the array. To eliminate bias, the photographs should all conform equally well to the witness's description of the offender, and the administrator should show each photograph individually.

¶ 34    On cross-examination, Dr. Loftus stated he did not speak with witnesses to the instant shooting or visit the scene and knew the lighting condition by reviewing Google Street view. Some

people are better able to memorize events than others, and Dr. Loftus could not testify regarding the abilities of the witnesses in this case. Dr. Loftus could not confirm that the witnesses only focused on the firearm or identified the wrong person from the photo arrays. On redirect examination, Dr. Loftus testified that people can only pay attention to one thing at a time.

¶ 35 Defendant entered stipulations that the court reporters who reported Sharetta's and Young's grand jury testimony certified the transcripts were accurate. When asked what part of the vehicle the shooter exited, Sharetta responded, "I didn't see was he on the passenger side or the back." Young stated she was looking for her phone in her car, and heard a voice say, "don't f*** move." She then heard her sister screaming, and six gunshots.

¶ 36 In closing, defense counsel argued, *inter alia*, that the identifications were not reliable or conclusive, and no other evidence supported defendant's guilt. The jury found defendant guilty of first degree murder and personally discharging the firearm that proximately caused the death of another person. The court denied defendant's motion for a new trial. After a hearing, the court sentenced defendant to 26 years' imprisonment with a 25-year firearm enhancement and denied his motion to reconsider sentence.

¶ 37 On appeal, defendant argues the State failed to prove beyond a reasonable doubt that he committed first degree murder because the eyewitness identifications were unreliable. Defendant contends the witnesses did not observe the shooter under circumstances "amenable to making a reliable identification," and made inaccurate and inconsistent identifications.

¶ 38 The standard of review for a challenge to the sufficiency of the evidence is "whether, viewing the evidence in the light most favorable to the State, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *People v. Belknap*,

2014 IL 117094, ¶ 67 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The trier of fact resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences from basic facts to ultimate facts. *People v. Brown*, 2013 IL 114196, ¶ 48. Accordingly, this court will not retry the defendant or substitute its judgment for that of the trier of fact on the weight of the evidence or credibility of witnesses. *Id.* A reviewing court will not reverse a criminal conviction unless the evidence is "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).

¶ 39    To prove defendant guilty of first degree murder as charged, the State had to prove he intentionally or knowingly shot and killed Corey with a firearm. 720 ILCS 5/9-1(a)(1) (West 2014). Defendant only challenges his identity as the offender.

¶ 40    The testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where contradicted by the defendant. *People v. Gray*, 2017 IL 120958, ¶ 36. Here, three eyewitnesses, Sharetta, Young, and Logan, viewed photo arrays and identified defendant as the shooter to police, before the grand jury, and at trial. Defendant, in turn, presented expert testimony regarding human perception and identification. The jury heard all the testimony, and by finding defendant guilty, determined the State's witnesses were credible in identifying him as the shooter. We defer to those credibility determinations. *Brown*, 2013 IL 114196, ¶ 48.

¶ 41    Nevertheless, defendant argues the three identifications were "highly unreliable," where the incident took roughly one minute, the lighting conditions were poor, and each witness was unable to adequately view the shooter from his or her vantage. Additionally, according to defendant, the presence of a firearm drew their attention from the shooter's face and their descriptions of the shooter were tainted by viewing defendant's photograph online or were

otherwise inaccurate. Lastly, although the witnesses were certain of their identifications, Dr. Loftus testified that certainty does not indicate reliability.

¶ 42    Where a finding of guilty depends on eyewitness testimony, the reviewing court must decide whether a factfinder could reasonably accept the testimony as true beyond a reasonable doubt. *Gray*, 2017 IL 120958, ¶ 36. Testimony is insufficient only "where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 43    In assessing identification testimony, we consider the factors set forth in *Neil v. Biggers*, 409 U.S. 188 (1972): (i) the witness's opportunity to view the defendant during the offense; (ii) the witness's degree of attention at the time of the offense; (iii) the accuracy of the witness's prior description of the defendant; (iv) the witness's level of certainty at the subsequent identification; and (v) the length of time between the crime and the identification. *People v. Slim*, 127 Ill. 2d 302, 308 (1989). "None of these factors, standing alone, conclusively establishes the reliability of identification testimony; rather, the trier of fact is to take all of the factors into consideration." *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 47 (citing *Biggers*, 408 U.S. at 199-200).

¶ 44    Regarding the first *Biggers* factor, the witnesses had ample opportunity to view defendant during the shooting. Sharetta and Young testified that the area was illuminated by street and house lights. Although the eyewitnesses observed the scene from different vantage points, each had sufficient opportunity to view the shooter during the incident, which Sharetta and Young estimated took a minute. Each witness was within several feet of the shooter and observed him walk backward to his vehicle after the shooting. All of the witnesses testified they saw the shooter's

face clearly and observed him long enough to note details concerning his physical characteristics, clothing, firearm, and vehicle. Although defendant contends the lighting conditions were poor and "not amenable to accurate recollection," the eyewitness testimony established that the area was illuminated, and the witnesses could see defendant's face. A positive identification need not be based upon perfect conditions for observation, nor does the observation have to be prolonged. *People v. Williams*, 143 Ill. App. 3d 658, 662 (1986). Given the eyewitnesses' detailed testimony, they each had ample opportunity to view defendant during the incident.

¶ 45 Regarding the second *Biggers* factor, the witnesses' degree of attention during the shooting favors the State. No evidence establishes defendant's position that their attention was compromised. Although the witnesses may have engaged in other activities before the shooter's vehicle arrived, each focused on the shooter during the incident. Further, no evidence supports defendant's assertion that Young and Logan were distracted from the shooter's face due to the presence of their children in their vehicle.

¶ 46 Defendant contends that inconsistencies in the witnesses' testimonies establish their attention was not on the shooter where Sharetta's trial testimony differed from her grand jury testimony regarding whether she saw the shooter reenter the vehicle, and also differed from the other witnesses regarding the direction the vehicle traveled when it left the scene. Additionally, Young testified inconsistently with her grand jury testimony regarding the number of gunshots, and Logan could not provide specific details about the event, including Young's location during the shooting and in which hand the shooter held the firearm.

¶ 47 Minor inconsistencies between witnesses or within one witness's testimony may affect the weight of the evidence, but do not automatically create reasonable doubt of guilt. *People v. Corral*,

2019 IL App (1st) 171501, ¶ 85. "[I]t is for the fact finder to judge how flaws in part of the testimony affect the credibility of the whole." *Cunningham*, 212 Ill. 2d at 283. The trier of fact may accept or reject all or part of a witness's testimony. *Id.* Here, the jury heard the witnesses' testimony, including the inconsistencies, and credited their identifications of defendant. We find no substantial discrepancies that warrant reversal on this basis. See *id.* at 284 (declining to disturb a conviction where no evidence showed that the only reasonable inference was that discrepancies made the entirety of the testimony unworthy of belief).

¶ 48    As to the third *Biggers* factor, each witness described defendant's clothing, height, build, and complexion to police. Although the descriptions differed slightly, minor inconsistencies or discrepancies in a description do not create reasonable doubt as long as a positive identification has been made. See *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 50. Here, each witness identified defendant as the shooter in a photo array, and the jury credited their identifications. To the extent defendant contends that Sharetta viewed a photograph of defendant online and potentially "tainted" the other witnesses' identifications by discussing it with them, this theory is speculative. Although Sharetta stated on cross-examination that she viewed a photograph of defendant prior to viewing the photo array on December 29, 2015, no evidence established that she discussed it with the other witnesses. Viewing the evidence in a light most favorable to the State, these minor discrepancies do not undermine the reliability of the identifications.

¶ 49    The fourth *Biggers* factor, the witnesses' degree of certainty, favors the identifications. Each witness was "100 percent" certain of defendant's identity as the shooter. Defendant contends that this factor "has been largely discredited since *Biggers*," and cites Dr. Loftus's testimony regarding perception and memory. According to Dr. Loftus, the witnesses' memories could have

been undermined due to various factors and changed since the initial event. However, Dr. Loftus did not evaluate the witnesses or comment on the specific circumstances of the case. The jury heard his testimony and determined its weight and credibility. See, *e.g.*, *People v. Moore*, 159 Ill. App. 3d 850, 857 (1987) ("The jury may reject expert testimony and base its findings on lay testimony [citation], or it may accept one expert's opinion over that of another."). We find no basis to warrant reversal with respect to this factor.

¶ 50    Lastly, as defendant concedes, the fifth *Biggers* factor, the length of time between the crime and identification, also favors the witnesses' identifications. Corey was shot after 9 p.m. on December 22, 2015. The witnesses described the shooter to officers. Sharetta and Young made their identifications one week after the shooting, and Logan made his identification two weeks after the shooting. Significantly longer lengths of time have not rendered identifications unreliable. See, *e.g.*, *People v. Malone*, 2012 IL App (1st) 110517, ¶ 36 (one year and four-month delay between crime and positive identification). Accordingly, the fifth *Biggers* factor favors the identifications.

¶ 51    Taken together, the *Biggers* factors support the reliability of the eyewitness identifications of defendant as the man who shot Corey on December 22, 2015. Accordingly, viewing the evidence in the light most favorable to the State, a rational trier of fact could have found defendant guilty of first degree murder beyond a reasonable doubt. We affirm defendant's conviction.

¶ 52    Affirmed.