2024 IL App (1st) 220477-U

No. 1-22-0477

Order filed May 31, 2024

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 16761 |
| | ) | |
| JAI DYER, | ) | Honorable |
| | ) | Joanne F. Rosado, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE TAILOR delivered the judgment of the court.
Presiding Justice Oden Johnson and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1  *Held*:  The evidence was sufficient to support defendant's conviction for attempted first degree murder over his contentions that the witnesses' testimony was contradictory and nonsensical, and that the victim's identification was "suspect." We remand the cause for a preliminary inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1981), into defendant's *pro se* posttrial allegations of ineffective assistance.

¶ 2  Following a bench trial, defendant Jai Dyer was found guilty of one count of attempted first degree murder, one count of armed robbery, and three counts of aggravated battery. At sentencing, the trial court merged its guilty findings and imposed 15 years in prison for attempted

first degree murder. On appeal, Dyer contends that he was not proven guilty beyond a reasonable doubt when the State's witnesses were inconsistent, contradictory, and nonsensical, and the victim's identification was "suspect" and uncorroborated. He further contends that the cause must be remanded pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), because the trial court did not make a preliminary inquiry into his posttrial *pro se* claim of ineffective assistance of counsel. We affirm, but remand for a preliminary inquiry pursuant to *Krankel*.

¶ 3    The State charged Dyer by indictment with one count of attempted first degree murder, one count of armed robbery, and three counts of aggravated battery arising out of an incident during which Jimmy Johnson was stabbed and slashed by a sharp object or knife.

¶ 4    At trial, Johnson testified that when he was on his way to Rashonda Smith's home, he was stabbed by an Uber driver, who he identified as Dyer.

¶ 5    Johnson testified that he usually communicated with Smith through the Facebook Messenger application. They messaged throughout the day on September 22, 2019. Later that night, around 2 a.m., Smith contacted him and said to "come over." He identified the printout of the screenshots of the Facebook Messenger messages.

¶ 6    After receiving the message to come over, Johnson tried to call Smith. He then replied to the message, and Smith responded, "just come." Johnson messaged to "hold on" and that he would call a ride. Smith replied that she would send one. When Johnson messaged, "where was the ride," Smith replied a few minutes later that it was outside. Johnson tried to call Smith three times, but she did not answer. When Johnson received a message that the Uber arrived, it was 3 a.m., dark and "drizzling." He described the vehicle as a "real" Uber with "flashing lights." The vehicle was dark-colored and had four doors. Johnson asked the driver if this was the Uber, and the driver

answered yes. At trial, Johnson identified Dyer as the driver. Johnson also identified People's Exhibit No. 3 as a photograph of the vehicle. We have reviewed the photograph of the vehicle and note that it is dark colored and appears both blue and silver.

¶ 7     Johnson entered the vehicle's rear passenger side and Dyer drove toward Smith's home. After about 10 minutes, when the vehicle was just several blocks from Smith's home, Dyer stopped, stated that Johnson was his "last stop," and asked if he could get his "drink" from the trunk. Johnson agreed. Dyer "ran" to the trunk, "grabbed something," and opened the back passenger door. As Johnson turned around, Dyer "poked" Johnson in the chest with a "sharp object" twice. At trial, Johnson pointed to an area below his collar bone and asserted that he had "staples."

¶ 8     Johnson kicked Dyer, exited the vehicle, and began running. Dyer chased him. Johnson slipped in the grass, and Dyer cut him in the neck. Johnson got up and ran. At one point, Johnson and Dyer were in the middle of the street, "looking at each other." Dyer looked at Johnson "all crazy and scared," then ran toward the vehicle, stopped to pick up "some stuff," entered the vehicle, and "took off." Johnson, who was bleeding "real, real bad," flagged a vehicle and asked that 911 be called. After speaking to police, he was taken to a hospital. There, a doctor told Johnson that an artery in his neck was "hit." Johnson received 42 stiches and two staples in his chest. As a result of his injuries, Johnson had scars on his face, neck, and chest.

¶ 9     He identified photographs of himself at the hospital. The State moved to admit them into evidence, which the trial court allowed. These photographs are included in the record on appeal. They depict a man's head with stiches from the mid-cheek to the back of the neck.

¶ 10    Johnson testified that he told a responding police officer on the scene that the Uber vehicle involved was a dark Corolla. He had never seen Dyer before that night. After the incident, he spoke to Smith and learned information that he shared with the police. Later, officers came to his home and showed him a photographic array in which he identified Dyer as the person who stabbed him. The "Photo/Live Lineup Advisory Form," which is included in the record, bears Johnson's signature and is dated September 27, 2019.

¶ 11    During cross-examination, Johnson testified that he was "[n]ot really" intoxicated that evening and that it was normal for him to communicate with Smith via Facebook Messenger and to go to her house to sleep. Sometimes Smith picked him up. Before this incident, Smith had never sent an Uber or Lyft to get him. The Uber vehicle's interior lights did not turn on when he opened the door.

¶ 12    Johnson did not know in which hand Dyer held the sharp object or knife. When Johnson was interviewed at the hospital, he told police that the offender wore a short-sleeved white t-shirt and jeans. It was dark and he did not remember seeing any arm tattoos. He told the officer the man was 5'6'' or 5'7'' in height but did not remember giving a weight. Smith told Johnson that Dyer may have been the person who injured him, but Johnson did not search for Dyer on Facebook. Johnson had never seen a photograph of Dyer prior to the array. He did not remember telling an officer that the vehicle was silver, only that it was "dark." He gave the information he received from Smith to the police. Johnson believed that his wallet and cell phone fell out of his pocket when he fell on the grass. When Dyer ran back to his vehicle, Johnson saw him pick up "some objects" from the grass. When Dyer was "looking at [him] crazy," Dyer stated, "that's my woman, that's my woman."

¶ 13    During redirect examination, Johnson testified that Dyer stated "that's my woman" after he "sliced" Johnson in the neck. The men were 10 to 15 feet apart for about 30 seconds. Johnson did not know what the objects were that Dyer picked up from the grass. He did not realize that he was missing his possessions until the police came and he looked for his "stuff." He last remembered having his phone and wallet in the Uber.

¶ 14    The parties stipulated that swab results taken from the vehicle were "no blood indicated."

¶ 15    Smith testified that Dyer, whom she identified in court, was her boyfriend between April and September 2019. On September 22, 2019, when Smith came home after work, Dyer was present and asked her to get back together. She declined. Dyer drove away in a 2019 Toyota Corolla, which was jointly owned by Smith and Dyer. Smith described the 2019 Toyota Corolla as "bluish."

¶ 16    Later that evening, Smith exchanged messages with Johnson on Facebook Messenger. She had known Johnson since 2014. To her knowledge, Dyer and Johnson did not know each other. Around 10 p.m., she messaged Johnson to "come lay with me" or "something like that." Then, she fell asleep. When she awoke the next morning, her phone was dead. After charging the phone, she received messages from Johnson's brother stating that "something" happened to Johnson.

¶ 17    Smith testified that her name on her Facebook account was "Nana."[1] Dyer knew her Facebook password and had previously accessed her Facebook account. Smith testified that she did not see Dyer access her Facebook account, presumably referring to the night in question although it is not clear from the record. Dyer also had access to her phone, which she did not lock.

---

[1] While the report of proceedings transcribed Smith's Facebook account name as "Nana," the printout admitted at trial depicts the account name as "Na Na."

¶ 18    The State then showed Smith printed screenshots of Facebook Messenger messages between her Nana account and an account belonging to Johnson. She identified the message she typed and sent to Johnson, which stated, "come sleep with me punk." The State moved to enter the printout of the messages into evidence, which the trial court allowed. Smith then testified that subsequent messages on the printout, which appeared to come from her Facebook account, were not sent by her personally. When she woke the following morning, these messages, as well as the message "come sleep with me punk," were not accessible in her Facebook account.

¶ 19    The Facebook Messenger message printout is included in the record on appeal. The initial message, "Come sleep with me punk," is followed by a notification of a missed call at 2:08 a.m. The subsequent messages from Johnson's account ask for a reminder of Smith's address, request that she pick Johnson up, and state that a cab was "talking [*sic*] all day." There is a notification at 2:35 a.m. that Nana missed a video chat. Then a message states that, "I got your ride on the way." There is a notification that Nana missed a call at 2:38 a.m. Then a message asks, "How long" and Nana's account replies, "15 to 20." Johnson's account asks if she called a ride or if it is "the people" he contacted. Messages from Nana's account state that she is too drunk to drive, that "he on his way," and that she will let Johnson know when the driver is outside. A message states, "He say he 5 minutes out." Another message states, "He say he outside I see you when you get here." Johnson's account replies, "Ok here I cum."

¶ 20    During cross-examination, Smith acknowledged that Dyer did not take her cell phone when he left and she did not see him again that night. She did not change her Facebook password after they broke up. Smith never saw Dyer use her Facebook account. The following morning, she did not receive a notification from Facebook that someone signed into her account. Smith and Johnson

previously had a romantic relationship, but were currently "just friends." When she asked Johnson to come "sleep" with her, she meant sleep, not sexual intercourse.

¶ 21    When Smith spoke with Johnson at a hospital, she suggested that Dyer "might" have attacked him. Defense counsel then asked for the "basis for that opinion", and Smith replied:

"if someone says that I sent them an UBER but I have no, you know, record of sending an UBER or anything or said that I had a conversation with them that I did not have, I wasn't completely drunk to the point that I don't remember.

And it just didn't make sense to me why would a person try to, you know, communicate with you, get you in this UBER, and do harm to you. It don't make sense. The only thing I could see is that."

¶ 22    Smith described the Toyota she owned with Dyer as "bluish" and identified photographs of the vehicle, including People's Exhibit No. 3. When Smith drove the vehicle after the incident, she did not see blood and it did not smell like it was recently detailed. Smith acknowledged that the message inviting Johnson to sleep with her did not have a timestamp. After Smith and Dyer broke up, Smith took back her house key from Dyer.

¶ 23    The defense presented Chicago police detective Douglas, who testified that Johnson described the offender as approximately 5'7'' and 210 pounds.[2] To Douglas' knowledge, Johnson was stabbed outside the vehicle and picked up by Lyft. During a second interview, Johnson provided a "[p]ossible offender's name."

¶ 24    Technology issues prevented the viewing of the responding officers' body camera footage and the parties asked the court for a moment to discuss the issue. The parties stipulated that the

_____

[2] The report of proceedings does not contain Douglas's first name.

camera footage contained conversations between Johnson and police at the scene which "could be interpreted as [Johnson] saying that he was stabbed initially in the car."

¶ 25    In closing argument, the defense asserted that there was no evidence of messages from Dyer regarding the Uber or that another device signed into Smith's Facebook account, and argued that the testimony of Smith and Johnson was "unsupported speculation." Defense counsel further argued that there was no blood or DNA evidence in this "very bloody attack," no "electronic connection" between Dyer and Johnson, and that Smith "suggested" to Johnson that Dyer was the offender. The State asserted that Johnson testified credibly and the lack of DNA evidence was not fatal. The State further argued that Smith testified that Dyer had access to her Facebook account and had accessed it previously.

¶ 26    In finding Dyer guilty of all counts, the trial court noted that Johnson had a relationship with Smith, who in turn had a relationship with Dyer, that Dyer had Smith's Facebook password, and that the alleged Uber driver yelled "that is my woman" to Johnson. The court concluded that there was "no other logical explanation" as to the attacker's identity "other than" Dyer. The court also found that Johnson had an opportunity to view the alleged Uber driver.

¶ 27    The court noted that the first time Johnson saw Dyer, Dyer was sitting, and weight and height could not be determined. The second time Johnson saw Dyer, Dyer was "on top of him," stabbing him in the chest; therefore, rather than "making a description," Johnson was "fighting for his life." The only time Johnson could "figure out" the attacker's description or weight was when they were face-to-face, but at that point the men were "trying to get at each other." However, the court did not think that the description of the offender was "necessarily" the issue.

¶ 28    Dyer filed a motion for a new trial alleging that he was not proven guilty beyond a reasonable doubt when the State failed to establish that he was the person who "lured" Johnson into the rideshare vehicle with Facebook messages.

¶ 29    At argument on the motion, trial counsel stated that he was "informed" that "other information *** could have been brought forward," but the information was not newly discovered.

¶ 30    Dyer then stated that he wanted to "assist" before the trial court ruled. Dyer argued that Johnson had no defensive wounds, Dyer was 6'1,'' no blood was found in the vehicle, and Johnson did not "point the finger" at Dyer until after speaking with Smith. Dyer did not know why he was involved when the situation was between Smith and Johnson. Dyer claimed to have an affidavit signed by Smith stating that Dyer was "never at the crib that day." Dyer denied being at Smith's home and asserted that footage from a camera across the street would have shown this. Although Dyer told trial counsel and the police about the camera, no one obtained the footage. Dyer also asserted that his attorney did not have records from Facebook which would show that he never logged into Smith's Facebook account.

¶ 31    The court then asked trial counsel whether anything Dyer stated was "newfound evidence." Counsel stated that the information existed prior to trial, but that he was not made aware of it. As to the affidavit by Smith, counsel stated it was in "contradiction" to three or four versions of the "story." While counsel would have liked "this to be true," counsel did not know based on "all the information" that had been provided. The State replied that "none of this was brought up at trial," and that it was not an appropriate time for Dyer to "put on a defense." The court then stated that Johnson and Smith were credible and that Johnson never testified as to an "exact size."

¶ 32    When the trial court asked Dyer whether he had discussed sentencing with trial counsel, Dyer answered yes. The court then asked whether Dyer was satisfied with trial counsel's services, and Dyer stated, "No answer." The trial court merged its guilty findings into the attempted first degree murder count and sentenced Dyer to 15 years in prison. Dyer filed a motion to reconsider sentence, which was denied.

¶ 33    On appeal, Dyer first contends that he was not proven guilty beyond a reasonable doubt when the State's witnesses' "stories" were inconsistent, contradictory, and nonsensical. He further contends that Johnson's identification was "suspect" and uncorroborated by physical evidence.

¶ 34    In reviewing a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *People v. Cline*, 2022 IL 126383, ¶ 25. The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts presented at trial. *People v. McLaurin*, 2020 IL 124563, ¶ 22. "In reviewing the evidence, this court will not retry the defendant, nor will we substitute our judgment for that of the trier of fact." *Id*. A defendant's conviction will be reversed only when the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of his guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 35    Here, to sustain Dyer's conviction for attempted first degree murder as outlined in the indictment, the State had to prove he, without lawful justification and with intent to kill, "slashed and stabbed" Johnson about the body, a substantial step toward the commission of first degree murder. See 720 ILCS 5/8-4(a), 9-1(a)(1) (West 2018).

¶ 36 Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt that Dyer committed the offense. Johnson identified Dyer as the driver of the Uber and identified the vehicle involved as a dark Corolla. Additional evidence established that Dyer and Smith jointly owned a Toyota Corolla. Johnson further testified that, at one point, he and Dyer stood 10 to 15 feet apart for about 30 seconds and Dyer stated, "that's my woman." While no physical evidence linked Dyer to the offense and he did not make an inculpatory statement, the testimony of a single witness is sufficient to sustain a conviction where it is positive and credible. *People v. Gray*, 2017 IL 120958, ¶ 36. Here, the trial court clearly found Johnson's testimony identifying Dyer as the attacker credible and the lack of physical evidence linking Dyer to the offense was not fatal to the State's case.

¶ 37 Dyer nonetheless contends that Johnson's identification was vague and "tainted" by Smith's suggestion that Dyer was the offender. He further notes that Johnson did not mention Dyer's tattoos and inaccurately and inconsistently described the offender's height and weight.

¶ 38 The State must prove the identity of the offender beyond a reasonable doubt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). While vague or doubtful identification testimony is insufficient to support a conviction, "[a] single witness' identification *** is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification." *Id.*

¶ 39 When assessing identification testimony, we rely upon the factors set forth in *Neil v. Biggers*, 409 U.S. 188 (1972). These factors include the witness's "opportunity" to view the offender at the time of the offense, the "degree of attention," the accuracy of the witness's prior description of the offender, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the offense and the identification. *Id.* at 199-200. No single factor

is conclusive in establishing the reliability of identification testimony. *People v. Joiner,* 2018 IL App (1st) 150343, ¶ 47. Instead, we consider the totality of the circumstances. *People v. Simmons,* 2016 IL App (1st) 131300, ¶ 89.

¶ 40    The *Biggers* factors, considered in relation to Johnson's identification of Dyer, weigh in the State's favor. First, as to the witness's opportunity to view the offender, Johnson testified that he approached the Uber and spoke to the driver. After fleeing from Dyer, there was a point at which the two men stood 10 to 15 feet apart for 30 seconds and stared at each other, with Johnson describing Dyer's facial expression as "crazy" and "scared." This was a sufficient opportunity to identify Dyer and this factor favors reliability. See *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 45 (evidence was not insufficient when one witness saw the offender for 5 to 10 seconds and another witness saw him for less than 5 seconds).

¶ 41    As to Johnson's degree of attention, he detailed the events preceding the stabbing, including speaking to the Uber driver, the make of the vehicle, the duration and route of travel, the driver's request to stop several blocks from Smith's home, the initial stabs to the chest while in the vehicle, and the subsequent chase and face-to-face confrontation. Thus, this factor weighs in favor of reliability. See *People v. Malone*, 2012 IL App (1st) 110517, ¶ 33 (a witness' "high degree of attention" was shown by her "detailed recollection" of defendant's actions from the time he entered the store until he brandished a firearm, took money from a register, and fled).

¶ 42    As to the accuracy of the prior description, Johnson testified that he described the offender's clothing to police and stated that the offender was 5'6'' or 5'7,'' but did not remember giving a weight. He further testified that he did not remember arm tattoos. See *People v. White*, 2017 IL App (1st) 142358, ¶ 18 (that the witnesses did not recall the defendant having a tattoo did

not render the "identification *** entirely unreliable" or "outweigh the factors in favor of the State"). Detective Douglas testified that Johnson described the offender as around 5'7'' and 210 pounds. No evidence was presented at trial establishing Dyer's height and weight, or that he had tattoos. Nor are there any pictures in the record of any tattoos that Dyer may have. Rather, Dyer asks this court to take judicial notice of his description on the Illinois Department of Corrections website (DOC), which he asserts indicates that he is 6'1'', weighs 252 pounds, and has tattoos on his neck, arms, and hands. See *People v. Johnson*, 2021 IL 125738, ¶ 54 (Illinois courts may take judicial notice of the DOC's records on its website). However, Dyer cites no authority for the proposition that a court may take judicial notice of the DOC's records of an inmate's physical characteristics, and we decline to do so here. Moreover, the DOC record that Dyer relies on reflects his weight on April 12, 2022, when he was admitted to Western Illinois Correctional Center, three years after the offense at issue here. Parenthetically, our review of Dyer's DOC inmate profile reveals Dyer is listed as 6'1,'' 230 pounds, and has tattoos to the neck, forearm, finger, and hands. See https://idoc.illinois.gov/offender/inmatesearch.html (last accessed Mar. 21, 2024). Although a younger or middle-aged adult's height is not likely to change significantly, the same cannot be said for weight. Relying on outdated DOC records to prove weight is suspect. Additionally, a review of the record before us reveals that Dyer's arrest report and his indictment state that he was 5'11" and 160 pounds.

¶ 43    Dyer asserts that Johnson's lack of detail as to the offender's physical characteristics weighs against Johnson's identification. However, any discrepancies in the description of an offender's height and weight do not invalidate an identification; they affect the weight to be given the identification testimony by the trier of fact. *Slim*, 127 Ill. 2d at 308, 312 ("[c]ourts typically

have not considered discrepancies as to height and weight alone as decisive factors on review because few persons are capable of making accurate estimations of such characteristics"). Here, it appears that Johnson's estimation of Dyer's height was off by a few inches. However, as the trial court noted, Johnson first saw Dyer seated, and only later, after having been stabbed and cut, saw Dyer in the street. Additionally, the trial court heard Johnson's description of the offender and Douglas's testimony as to Johnson's description of the offender, observed Dyer in court, and found the identification sufficient. See *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 34 (finding an identification reliable over defendant's contention that the witnesses' descriptions that were "at odds" with his actual appearance, noting that the trial court weighed the discrepancies and found that positive identifications were made). Our supreme court has explained that such discrepancies in the description of an offender's height and weight are not uncommon, and witness identifications have been found sufficient despite height discrepancies of up to 6½ inches and weight discrepancies of up to 60 pounds. *Slim*, 127 Ill. 2d at 311-12.

¶ 44    Finally, regarding the certainty of the witness's subsequent identification and the time between the offense and the identification, Johnson identified Dyer in a photographic array and in court, and the record does not indicate that he expressed any uncertainty when he made the identifications. See *White*, 2017 IL App (1st) 142358, ¶ 19 (finding the facts that the witness made a positive identification and "no evidence in the record shows any uncertainty" favored a reliable identification).

¶ 45    Dyer argues Johnson's identification was "tainted" by Smith. However, Smith only said it "might" have been Dyer who attacked him. Moreover, Johnson's testimony that Smith gave him a name but that he had never seen a photograph of Dyer prior to the photographic array, and that

he had never met Dyer prior to the incident, was unrebutted. Moreover, while Smith had given Johnson a partial license plate number of the 2019 Toyota Corolla that she shared with Dyer, Johnson testified he knew the vehicle was a Corolla prior to speaking with Smith. Additionally, Johnson identified Dyer in a photographic array on September 27, 2019, five days after the incident. This court has found that significantly greater lengths of time have not rendered identifications unreliable. See *Malone*, 2012 IL App (1st) 110517, ¶ 36 (16-month delay between crime and positive identification). Accordingly, we cannot say that Johnson's identification of Dyer was so unreliable that a reasonable doubt exists as to Dyer's guilt. *McLaurin*, 2020 IL 124563, ¶ 22.

¶ 46    Dyer further argues that Smith's testimony denying that she sent certain Facebook Messenger messages was incredible because there was no evidence that Dyer took her phone to access the account and send the messages, and she did not receive a message that her account had been accessed. As noted, Smith acknowledged sending Johnson the initial message inviting him over, but denied sending the messages arranging his transportation. Smith further testified that Dyer had her Facebook account password, which she did not change after their breakup, and that Dyer had previously accessed her account. When weighing the evidence, the trier of fact is not required to disregard inferences flowing naturally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to the level of reasonable doubt. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60. Here, a rational trier of fact could infer that Dyer, who had access to Smith's Facebook account and wanted to resume their relationship, sent messages from her Facebook Messenger account to Johnson arranging transportation after Smith invited Johnson to come over to "sleep." See *id.* (a trier of fact need not be satisfied beyond a

reasonable doubt as to each "link in the chain of circumstances"; rather, "it is sufficient if all the evidence taken together satisfies the trier of fact beyond a reasonable doubt" of the defendant's guilt). As a result, even though the exact circumstances of how Dyer lured Johnson may be unknown, the fact remains that Johnson was injured and he positively identified Dyer as the person who stabbed him.

¶ 47    Given the evidence adduced at trial, we cannot say that no rational trier of fact could have found Dyer guilty of attempted first degree murder. *McLaurin*, 2020 IL 124563, ¶ 22. We reverse a defendant's conviction only when the evidence is so unreasonable, improbable, or unsatisfactory that reasonable doubt of his guilt remains (*Newton*, 2018 IL 122958, ¶ 24); this is not one of those cases. Dyer's conviction is therefore affirmed.

¶ 48    Defendant next contends, and the State concedes, that the cause should be remanded for a limited preliminary inquiry pursuant to *Krankel*. Dyer argues that when he complained to the trial court about evidence that trial counsel did not present at trial, the court merely asked whether the evidence was new and for the State's input. This, according to Dyer, was not an adequate preliminary *Krankel* inquiry.

¶ 49    Pursuant to *Krankel* and its progeny, a procedure has developed to address *pro se* posttrial claims of ineffective assistance. *People v. Jackson*, 2020 IL 124112, ¶ 95. When a *pro se* defendant brings a claim of ineffective assistance to the trial court's attention, the court should conduct a preliminary inquiry during which it briefly discusses the claims with the defendant, inquires with trial counsel about the facts and circumstances surrounding the claims, and considers its knowledge of counsel's performance at trial. *People v. Jolly*, 2014 IL 117142, ¶ 30. If the court determines that the defendant's claims lack merit or pertain to trial strategy, it may deny the *pro*

*se* motion. *People v. Roddis*, 2020 IL 124352, ¶ 35. But, if the claims show possible neglect of the case, new counsel should be appointed. *Id*. ¶¶ 35-36.

¶ 50 To trigger the duty to conduct a preliminary *Krankel* inquiry, "a *pro se* defendant is not required to do any more than bring his or her claim to the trial court's attention." *People v. Moore*, 207 Ill. 2d 68, 79 (2003); see also *People v. Ayres*, 2017 IL 120071, ¶ 11 (defendant may bring the claim to the court's attention orally or through a letter or note). "No factual specificity is required; indeed, the point of the preliminary *Krankel* inquiry is to *develop* that factual specificity to determine whether the claim is sufficient to show possible neglect of the case, thus warranting the appointment of new counsel" (Emphasis in original.) *People v. Downing*, 2019 IL App (1st) 170329, ¶ 55. While a defendant need not use the phrase " 'ineffective assistance of counsel' " to trigger a preliminary inquiry, he "must at least mention his attorney." *People v. Thomas*, 2017 IL App (4th) 150815, ¶ 31. We review *de novo* whether a defendant's allegations suffice to trigger the duty to conduct a preliminary *Krankel* inquiry. *People v. Taylor*, 237 Ill. 2d 68, 75-76 (2010).

¶ 51 We agree that Dyer's statements to the trial court were sufficient to trigger the court's duty to conduct a preliminary *Krankel* inquiry. During the argument on the motion for a new trial, Dyer asked to assist and identified several pieces of evidence that allegedly would have proved his innocence had counsel introduced them at trial, including a video that would have contradicted Smith's testimony that he was at her home and an affidavit from Smith recanting portions of her testimony. Most importantly, however, when the trial court asked Dyer whether he was satisfied with trial counsel's representation, Dyer answered, "No comment." Dyer's statements did not include the phrase "ineffective assistance," but were complaints about trial counsel's performance. See *Ayres*, 2017 IL 120071, ¶ 11 Under these circumstances, we agree with the parties that Dyer's

statements triggered a duty for the trial court to conduct a preliminary *Krankel* inquiry into Dyer's claims of ineffective assistance.

¶ 52     Accordingly, we remand to the circuit court with directions to conduct a preliminary *Krankel* inquiry into Dyer's *pro se* allegations of ineffective assistance. We affirm the judgment of the circuit court of Cook County in all other respects.

¶ 53     Affirmed in part; remanded with directions.