2025 IL App (1st) 250399-U

FIFTH DIVISION
December 19, 2025

No. 1-25-0399

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 19 CR 16761 01 |
| | ) | |
| JAI DYER, | ) | The Honorable |
| | ) | Joanne F. Rosado, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE TAILOR delivered the judgment of the court.
Justices Mikva and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The judgment of the trial court is reversed. The trial court reversibly erred when it concluded that defendant's ineffective assistance of counsel claim was meritless after a *Krankel* hearing and that the appointment of new counsel was not warranted.

¶ 2                                    I. BACKGROUND

¶ 3    Jai Dyer was indicted for attempted first degree murder, armed robbery, and several counts of aggravated battery. These charges stemmed from an incident that occurred in the early morning hours of September 23, 2019, after Dyer's former girlfriend, Roshonda Smith, sent a text message to her friend Jimmy Johnson via Facebook to "come over." After Johnson told Smith he would

call for a ride, Smith messaged back that she would send a car for him on the Uber ride service application. When Smith texted Johnson that the ride was outside of his home, Johnson got into the Uber and the driver headed towards Smith's home. When they were a few blocks away from Smith's home, the driver stopped the car, grabbed something from the trunk, opened the rear door where Johnson was sitting, and then stabbed Johnson several times. The encounter continued outside the vehicle where driver cut Johnson's neck. Johnson was taken to the hospital, where he spoke to police, and was shown a photo array. Johnson identified Dyer as his attacker. Dyer elected to proceed before a bench trial.

¶ 4     At trial, the State argued in its opening statement the evidence would show that Dyer was the man who attacked Johnson, a man with whom Smith was in a "friendly, maybe a friends-with-benefits relationship." It argued that Dyer must have been the man who sent the text messages to Johnson that night, because Smith would testify that she did not send them and Dyer was the only other person with access to her Facebook account. The defense argued in its opening statement that Dyer was "not the mystery UBER driver" who attacked Johnson. Defense counsel argued that the description of the attacker Johnson provided to police did not match Dyer, and that the State would present no evidence of Dyer accessing Smith's Facebook account or phone, or any blood or DNA evidence tying Dyer to the crime.

¶ 5     Roshonda Smith testified that she and Dyer dated for several months in 2019, but she broke up with him in early September after he cheated on her. After Smith ended her romantic relationship with Dyer, they continued to work together at a food manufacturing warehouse. On September 22, 2019, Smith and Dyer worked the second shift, which ended around 9:30 pm. After Smith got off work, she went straight home and found Dyer sitting in front of her house, waiting to talk to her and "trying to get [her] back." She spoke to him but told him she "wasn't trying to

2

hear that." She then watched him drive off in the "bluish" 2019 Toyota Corolla that she jointly owned with Dyer.

¶ 6    Around 10 pm, Smith sent a message through the Facebook Messenger application to Jimmy Johnson, an old friend. She texted Johnson to "come lay with [her]" and then "passed out." When she woke up the next morning, her phone battery was dead. After she charged her phone, she found messages from Johnson's brother saying something had happened to Johnson. When Smith was shown a screenshot that showed a number of messages that were sent from her Facebook account to Johnson, she admitted that she sent the first message, which said "come sleep with me, punk" but said she did not send the rest of the messages even though they all appeared to come from her Facebook account. Smith testified that Dyer had access to her Facebook account, knew her Facebook password, and had accessed her Facebook account before. She did not change her Facebook password after they broke up.

¶ 7    After she received the messages from Johnson's brother, Smith went to the hospital to see Johnson, and she suggested that Dyer might have been the man who attacked him. Johnson and Dyer did not know one other. When Smith was asked why she thought Dyer might have been the one who attacked Johnson, she said, "[b]ecause if someone says that I sent them an UBER but I have no *** record of sending an UBER or anything or said that I had a conversation with them that I did not have, I wasn't completely drunk to the point that I don't remember. And it just didn't make sense to me why would a person try to, you know, communicate with you, get you in this UBER, and do harm to you. It don't make no sense. The only thing I could see is that."

¶ 8    Jimmy Johnson testified next. He said that around 2 am on September 23, 2019, he received a message from Smith via Facebook Messenger telling him to come over. He then tried to call Smith, but she didn't answer. Johnson then texted Smith and said he would call a ride but Smith

3

messaged that she would send an Uber. Johnson tried to call Smith a few more times but she did not answer. When Johnson received a message that an Uber was waiting outside his home, he went outside and saw a dark colored four-door car in front of his house. When he asked the driver, "Are you the UBER?" the driver said yes. Johnson got in the car, and identified Dyer as the driver of what he believed to be the Uber. Johnson took screen shots of the messages he received from Smith via Facebook that night and gave them to police. These screenshots were admitted into evidence.

¶ 9 The Uber driver drove in the general direction of Smith's house, and when they were a few blocks away, the Uber driver asked Johnson if he could stop and get his drink. After Johnson agreed, the driver ran to the trunk, grabbed something, and then opened the door and "poked [Johnson] in [the] chest with a sharp object" twice. Johnson kicked the man, got out of the car, and started running. As the Uber driver started chasing him, Johnson slipped on the grass. Johnson felt the Uber driver cut him on the neck, then Johnson got up and started running again. At one point, he and the driver stood about 10-15 feet apart, facing one another. The driver was "looking at [Johnson] crazy" and saying, "that's my woman, that's my woman." The driver then started running back towards his car. He stopped and picked up some objects from the grass, and then got back in the car and drove off. Johnson assumed the Uber driver had picked up his wallet and cell phone, because Johnson had these items when he was in the back of the Uber and assumed they fell out of his pocket when he slipped on the grass during the attack.

¶ 10 Johnson flagged down a car and asked the occupants to call 911. When the police arrived, they called an ambulance for Johnson and he was taken to the hospital. He received 42 stitches in his neck and two staples in his chest.

¶ 11 When Johnson was interviewed by police, he told them the Uber driver, who he had never seen before, was driving a dark Corolla. Johnson was "not really" intoxicated that night, and there

were street lights on so he got a pretty good look at the man who attacked him. Johnson said that the man was short, 5'6" or 5'7", and was wearing a white t-shirt and blue jeans. Johnson could not recall if the man had any tattoos on his arms, but explained that he "wasn't paying no attention to whether [the man] had any tattoos" because "the only thing on [his] mind was making sure this man d[id]n't try to come at [him] again with whatever object he had up in his hand."

¶ 12    Johnson was shown a photo array and picked Dyer out as the man who attacked him. Although Smith told Johnson she thought Dyer might have been the man who attacked him, Johnson did not look Dyer up on Facebook and had never seen a photo of Dyer before he viewed his photo in the police photo array.

¶ 13    After the State rested, the defense moved for a directed verdict but the court denied the motion. The defense then presented testimony from Detective Douglas of the Chicago Police Department. Douglas testified that he was assigned to investigate a robbery case. He viewed the body camera footage from the officers who had responded to the scene before he was assigned to the case. Although the body camera footage was unavailable at trial due to "[t]echnology problem[s]," the parties stipulated that the body camera footage shows Johnson saying he was stabbed both inside and outside of the car. Douglas and his partner visited the crime scene and canvassed the area, but they were unable to locate any witnesses or recover any security camera footage of the incident. Douglas spoke to Johnson, who said he was supposed to get a ride to his friend's house in a Lyft (an Uber competitor). Johnson described his attacker to Detective Douglas as about 5'7" in height and around 210 pounds in weight.

¶ 14    After the court admonished Dyer and Dyer said he did not wish to testify, the defense rested. During closing arguments, the defense argued that there was "no evidence of [Dyer] accessing *** any of [Smith's] online accounts to send messages to the victim," and no "evidence

of any Uber messages coming from [Dyer]" or from his phone. The defense also argued that the victim's description of his attacker was vague, and that there were no witnesses or any physical evidence linking Dyer to this crime. Defense counsel also noted that although this was "a very bloody attack," there was no blood found in Dyer's vehicle, and that although the victim claimed he was robbed of his cellphone and wallet, "[t]hese proceeds were not found on the defendant at all."

¶ 15    The State argued in response that "[t]estimony is evidence and circumstantial evidence is evidence as well, [and] just because there is no DNA evidence doesn't mean that the State doesn't have evidence to establish that this defendant is guilty beyond a reasonable doubt." The State noted that Johnson identified Dyer as the person who stabbed him and the person who pretended to be his Uber driver, and argued that Johnson's testimony was "credible" and "unimpeached" and that Smith's testimony corroborated Johnson's testimony.

¶ 16    Explaining its ruling, the court stated that Johnson had a relationship with Smith, who had been in a dating relationship with Dyer, that Dyer had Smith's Facebook password, and that the alleged Uber driver yelled to Johnson, "that is my woman[.]" It found the only "logical" explanation" of the attacker's identity was Dyer, and that Johnson had a sufficient opportunity to view the Uber driver.

¶ 17    After the court convicted Dyer on all counts, Dyer filed a motion for a new trial, alleging that the State had failed to prove him guilty beyond a reasonable doubt. In response, the State argued that it "certainly" proved its case beyond a reasonable doubt. It noted Johnson had multiple opportunities to view his attacker, and that his testimony was "credible" and "unimpeached."

¶ 18    Before the court issued its decision, Dyer asked to "invok[e] his right to assist counsel." He argued that Johnson's description of the attacker as 5'7" was inconsistent with his height of

6'1", there was no blood evidence found in his vehicle, and Johnson did not "start pointing the finger in [his] direction" until after he spoke with Smith. Dyer also claimed he had a signed affidavit from Smith saying he was "never at [her] crib" on the day of the attack. He claimed he told police about a camera across the street from Smith's house that would have showed that he was not at Smith's house that day but "[n]o one obtained this." He also claimed defense counsel did not have the records from Smith's Facebook account, which would show that he never logged into her account.

¶ 19    The court then asked defense counsel if anything Dyer had discussed was "newfound evidence." Defense counsel said the information existed before trial but he was not made aware of it. He noted that the affidavit from Smith was "in contradiction to about three or four versions of the story that I have heard." He said it was "hard for [him] to believe" it was true "based on all the information that we have been provided." The court denied the motion for a new trial and sentenced Dyer to 15 years.

¶ 20    Dyer appealed, challenging the sufficiency of the evidence presented at trial and arguing that remand for a preliminary inquiry into his ineffective assistance of counsel claims was warranted. In *People v. Dyer*, 2024 IL App (1st) 220477-U, we found the evidence sufficient to support Dyer's convictions, but, as the State conceded, remanded for a preliminary inquiry pursuant to *People v. Krankel,* 102 Ill. 2d 181 (1984), into Dyer's posttrial allegations of ineffective assistance of counsel.

¶ 21    On February 6, 2025, the trial court held a *Krankel* hearing to address Dyer's ineffective assistance of counsel claims. First, the trial court asked Dyer to voice his concerns about defense counsel's representation at trial. Dyer told the court that defense counsel didn't "actually investigate[] the case." He argued that timesheets and video from his job—which defense counsel

did not obtain—would show that he was clocking out from work at the time Smith said he was at her house, and that video footage from the church across the street from Smith's house and a Ring doorbell camera from Smith's home would show he was not at Smith's home on the day of the attack. In addition, Dyer argued that evidence obtained through the search warrant for Smith's Facebook account "would have shown that [he] never logged into her account." He noted that defense counsel had received the results of the Facebook account search but "failed to use the results to defend [him]."

¶ 22 Next, Dyer voiced his concern that defense counsel "didn't question Detective Douglas fully" and just "sat back at the table when the State questioned Mr. Johnson about *** the photo array" but failed to properly challenge the reliability of his identification. Finally, Dyer argued that defense counsel failed to impeach Smith with an affidavit he shared with defense counsel before trial. At sentencing, Dyer had explained to the court that in this affidavit, Smith said Dyer "was never at [her] crib that day." He argued that if the affidavit "goes against *** multiple statements that [Smith] made [at trial] – isn't that the reason that you use it? Because it attacks her credibility."

¶ 23 The court then heard from defense counsel. Defense counsel testified that Dyer "mentioned to [him] on the day of trial that there was a video at his place of work and then a video across the street from Ms. Smith's house" but explained that he didn't ask for a continuance in order to obtain these videos because they would only show what happened more than four hours before the attack on Johnson and thus were not relevant or exculpatory. He said he was "not aware" of the Ring camera from Smith's home. Defense counsel said he "didn't think [the videos] w[ere] really relevant to the chain of events that were the bases of the charges against Mr. Dyer" and for that reason, he "made a strategic decision for [his] trial tactics to focus on other things."

¶ 24 Next, defense counsel addressed the search warrant for Smith's Facebook messages. He

8

said he reviewed the "Facebook dump" provided by the State in discovery but "didn't find anything that was helpful for [Dyer's] side of the case." Moreover, because the State "didn't even bring anything out of the Facebook dump," defense counsel "didn't figure [it] was necessary or relevant to the trial strategy."

¶ 25 Third, defense counsel addressed the Smith affidavit he received from Dyer. He said that he had seen Smith's affidavit and spoken with her before trial, but that because she was placed under oath at trial and "could have said exactly what she allegedly said in the affidavit" and yet chose not to do so, he found the affidavit "not applicable."

¶ 26 Finally, defense counsel said Dyer's allegations regarding the effectiveness of his cross-examination efforts were fairly subjective. He told the court he had "multiple jail visits" with Dyer and that he "represented [Dyer] to the best of [his] ability" and therefore Dyer's ineffective claim was "baseless."

¶ 27 In ruling, the court stated,

"I have had an opportunity to review the *Krankel* inquiry, the items that were talked about, the timesheet, video from the church, investigations about cameras, search warrants. So [defense counsel] has explained that he chose not to use these items because of his trial strategy. Although Mr. Dyer may not like the results, that is what [defense counsel] was paid for as a counselor to provide his experience and he makes a determination as to trial strategy.

With regards to the Facebook account that Mr. Dyer spoke about, [defense counsel] indicated there was a Facebook dump and there was nothing in there that was helpful for the case. Again, trial strategy, and he chose not to use anything, and he also pointed out the fact that even the State didn't use anything from the Facebook dump. So that covers the

bigger issue of whether investigations were done or not done. [Defense counsel] indicated that he was informed about a RING camera on the day of trial, and based on his trial strategy of Mr. Dyer saying he was not there, there was no need to look at the RING camera or deal with the RING camera.

With regards to the next portion of what Mr. Dyer is claiming is he was not properly defended, [defense counsel] spoke about his strategy. How he executed his strategy and the fact that, you know, perhaps Mr. Dyer didn't like the questions [defense counsel] asked or how he formed his questions, but that he did the best he could based on his experience as an attorney, and that was the way he handled the case. There's nothing here to say that we need to go forward on the ineffective assistance of counsel based on trial strategy, everything that was performed by [defense counsel]. So therefore, the *Krankel* hearing is done. It will go no further, and this case will be off call."

¶ 28 The trial court denied Dyer's ineffective assistance of counsel claims after the *Krankel* hearing, and Dyer timely appealed.

¶ 29                                II. ANALYSIS

¶ 30 Dyer does not challenge the procedures employed by the trial court in conducing the *Krankel* hearing, but argues that defense counsel's possible neglect of his case is evident in the record, so remand is warranted for the appointment of counsel to present his ineffective assistance claims under *People v. Krankel*, 102 Ill. 2d 181, 189 (1984). "[W]hen a defendant presents a *pro se* posttrial claim of ineffective assistance of counsel, the trial court should first examine the factual basis of the defendant's claim. If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be

appointed." *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). " '[T]he operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the *pro se* defendant's allegations of ineffective assistance of counsel.' " *People v. Bull,* 185 Ill. 2d 179, 210 (1998) (quoting *People v. Johnson*, 159 Ill. 2d 97, 125 (1994)). While an attorney's strategic decisions are not normally subject to a claim of ineffectiveness, a defendant may overcome the strong presumption of sound trial strategy if the attorney's decisions were objectively unreasonable. *People v. Maya*, 2019 IL App (3d) 180275, ¶ 27.

¶ 31                                    A. Standard of Review

¶ 32    The parties disagree about the standard of review. Dyer argues that we should review his claim *de novo*, whereas the State argues that the manifest weight of the evidence standard applies. The standard of review for the adequacy of a *Krankel* hearing depends on the trial court's actions. "[I]f the trial court made no determination on the merits, then our standard of review is *de novo*." *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25. However, "[i]f a trial court has reached a determination on the merits of a defendant's ineffective assistance of counsel claim, we will reverse only if the trial court's action was manifestly erroneous." *Id.*

¶ 33    After hearing from Dyer and defense counsel here, the trial court reached the merits of Dyer's claims, finding that defense counsel made decisions based on his trial strategy, and concluding there was "nothing here to say that we need to go forward on the ineffective assistance of counsel [claim]." Therefore, the manifest weight of the evidence standard applies. "Manifest error is error that is clearly evident, plain, and indisputable." *People* v. *Jackson*, 2020 IL 124112, ¶ 98. We now turn to the question before us—whether the evidence presented at the *Krankel* hearing showed counsel's "possible" neglect of Dyer's case.

¶ 34                                    B. Cross Examination of Johnson

¶ 35     First, Dyer argues that defense counsel's possible neglect of his case is evinced by defense counsel's "disastrous cross-examination of Jimmy Johnson." He points to the fact that defense counsel elicited testimony from Johnson that Dyer said, "that's my woman", during their encounter, but then made no effort to mitigate this "extremely damaging" testimony by eliciting from Johnson that he never told police or prosecutors about this statement, which would have undercut his credibility. Dyer contends that the State would have elicited from Johnson the "that's my woman" testimony in direct examination had Dyer actually said that to him, and the fact that it did not shows that Johnson fabricated that testimony.

¶ 36     While "[t]he manner in which to cross-examine a particular witness involves the exercise of professional judgment which is entitled to substantial deference from a reviewing court" (*People v. Pecoraro,* 175 Ill. 2d 294, 326-27 (1997)), this court has previously found counsel ineffective when he "elicit[ed] damaging testimony not presented as part of the State's case," stating, "we cannot find a valid trial strategy in defense counsel's pursuit of this line of questioning." *People v. Bailey*, 374 Ill. App. 3d 608, 614 (2007).

¶ 37     The State admits that Johnson's "that's my woman" statement was "damaging" to Dyer's defense, but argues that "Johnson's testimony did not 'prove' an element that other evidence had not already established" because Johnson had already identified Dyer as his attacker. However, Johnson's description of his assailant to police—as a "short man" who was 5'6" or 5'7" weighing 210 pounds—is inconsistent with Dyer's height and weight—according to his arrest report, he is 5'11" and weighed 160 pounds at the time of his arrest. Potentially due to these inconsistencies, the State relied on Johnson's "that's my woman" statement to bolster its theory of the case, and the court relied on the statement as well, noting that when Johnson and the Uber driver were standing face to face, the Uber driver yelled "that's my woman" before slicing Johnson on the

12

neck, and concluding there was "no other logical explanation" as to the attacker's identity besides Dyer. Therefore, we find that defense counsel's elicitation of the damaging "that's my woman" statement from Johnson and his failure to take any steps to mitigate the harm by establishing that he never told police or prosecutors about this statement demonstrate counsel's possible neglect of Dyer's case.

¶ 38                                    C. Timesheets and Security Cameras

¶ 39    Next, Dyer argues that defense counsel's failure to investigate the timesheets and security cameras at his work and across the street from Smith's house show possible neglect of his case. He argues that this evidence could have potentially rebutted Smith's testimony that he came to her home after work and asked her to reconcile but she rejected him, and that "this evidence potentially would have rebutted the prosecution's theory of the motive for the attack." When asked why he did not attempt to obtain the timesheets or cameras from Dyer's workplace or Smith's home, defense counsel testified that he "didn't think [the videos] w[ere] really relevant to the chain of events that were the bases of the charges against Mr. Dyer" because these videos would only show what happened more than four hours before the attack and, for that reason, he "made a strategic decision for [his] trial tactics to focus on other things." However, defense counsel's admitted failure to obtain the timesheets or videos to see whether Dyer was in fact at Smith's house on the night of the attack as Smith claimed demonstrates his possible neglect of Dyer's case, as these videos could have rebutted the prosecution's theory of the case—that Dyer was angry over Smith's rejection of his attempts at reconciliation earlier that night, and that is the reason he planned and carried out an attack on her longtime companion, Johnson.

¶ 40                                    D. Smith's Affidavit

¶ 41    Finally, Dyer argues that trial counsel potentially neglected his case by failing to impeach

13

Smith with an affidavit he tendered to defense counsel before trial, in which Smith stated that Dyer was never at her home on the night of the attack. He argued that this affidavit "would have undermined the prosecution's theory that Dyer was so angered by Smith's rejection [of his efforts to restart a romantic relationship at the doorstep of her home] that he executed a plan to attack Johnson, a longtime companion of Smith's."

¶ 42 Smith's affidavit is not part of the record, nor is there any indication that Dyer presented the affidavit to the trial court to review. However, the court asked defense counsel after trial if he had seen Smith's affidavit and he confirmed that he had, but explained that because the affidavit was "in contradiction to about three or four versions of the story" he had heard, it was "hard for [him] to believe" the affidavit was true. And at the *Krankel* hearing, defense counsel said that he had seen Smith's affidavit and spoken with her before trial, but that because she was placed under oath at trial and "could have said exactly what she allegedly said in the affidavit" and yet chose not to do so, he found the affidavit "not applicable."

¶ 43 While "[t]he impeachment of witnesses is generally considered a matter of trial strategy, immune from claims of ineffective assistance of counsel" (*People v. Phillips*, 2017 IL App (4th) 160557, ¶ 58), impeaching witnesses with inconsistent statements in order to test their credibility is one of the main purposes of cross examination. *People v. Hall*, 195 Ill. 2d 1, 23 (2000). We can discern no strategic reason why defense counsel would not impeach Smith with her affidavit in which she stated that Dyer was not at her house on the evening in question. Doing so would have cast doubt on her credibility and undermined the State's theory of the case, which was that Dyer was angry with Smith for rejecting him earlier that night and therefore hatched a plan to attack her companion Johnson. See *People v. Abadia*, 328 Ill. App. 3d 669, 679-80 (2001) (noting that unlike the prosecution, who bears the burden of proof beyond a reasonable doubt, the defense need not

14

present any evidence of innocence, and instead may posit alternative theories "to engender reasonable doubt in the minds of jurors"). Therefore, we find that counsel's failure to use this affidavit demonstrates possible neglect of Dyer's case.

¶ 44    Taken together, the trial court's findings—that defense counsel made decisions based on trial strategy, and that there was "nothing here to say that we need to go forward on the ineffective assistance of counsel [claim]"—were against the manifest weight of the evidence. Defense counsel's failure to investigate and to more comprehensively cross examine Smith and Johnson demonstrates possible neglect of Dyer's case. Therefore, we reverse and remand for new counsel to be appointed for Dyer to pursue his ineffective assistance of counsel claim.

¶ 45                              III. CONCLUSION

¶ 46    For the foregoing reasons, the judgment of the trial court is reversed and remanded for the appointment of new counsel for Dyer to pursue his ineffective assistance of counsel claim.

¶ 47    Reversed.